## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| Phil Rosemann; Hal and Jan Millsap; Diane and David Caldwell; William and Carol Phillips; Edward Chunglo; Calvin Wright; Stan Kuhlo; Paul and Margaret Fancher; Wanda and Carl Lavender; William Gaylor; Leonard Roman; Frank and Helga Costello; Kenneth and Shirley Potgeter; Ronald Pastor; David Schultz; Brian Waffle; Nina Blaylock. ) ) ) ) ) ) ) ) ) ) | Case No. _____ |
| ) | Judge _____ |
| Plaintiffs, ) | |
| vs. ) | |
| ) | DEMAND FOR JURY TRIAL |
| Martin Sigillito and DOES 1 through 50 inclusive, ) ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## COMPLAINT

## COUNT 1
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)

COMES NOW Plaintiffs and for their complaint for violation of 18 U.S.C. § 1962(c) against each Defendant individually, jointly and severally, state as follows:

### JURISDICTION AND VENUE

1.      There are multiple bases for this Court's jurisdiction as the allegations in this complaint allege violations of the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. §§ 1961-68 giving this Court jurisdiction pursuant to 18 U.S.C. § 1964(c) over those claims. The allegations in this complaint also allege state claims "so related to claims in the action" that "they form part of the same case or controversy" giving this Court supplemental jurisdiction over those claims pursuant to 28 U.S.C. §1367(a).

2.      Venue is proper in the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(a)(2) ("judicial district in which a substantial part of the events or omissions giving rise to the claim occurred") because a substantial part of the events and omissions giving rise to the loan default occurred in St. Louis County, Missouri, which is located within the geographical area of this court. See 28 U.S.C. § 105(a)(1) (Eastern Division of the Eastern District of Missouri comprises St. Louis County).

**DEFENDANTS**

3.      Defendant Martin Sigillito is an individual and citizen of Missouri with a home address of 100 South Gore Ave., St. Louis, Missouri 63119 and a business office address of 7710 Carondelet Avenue, Suite 208, St. Louis, Missouri 63105.

4.      Plaintiffs are ignorant of the true names and capacities of defendants sued as **DOES 1 through 25 inclusive**, and therefore sue these defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe and on that basis allege that each of the fictitiously named defendants was agent, servant or employee

of each remaining defendant and was acting within the purpose, scope, course and authority of such agency and employment, and are legally responsible in some manner for the occurrences alleged in this complaint, and that plaintiffs' damages or losses were proximately caused by the fictitiously named DOE defendants.

5.     Plaintiffs are informed and believe and on that basis allege that all of the defendants joined in, gave consent to, authorized, approved and ratified the acts and omission alleged herein to each of the remaining defendants. Whenever in this Complaint a reference is made to any act done by any Defendant acting individually, these allegations shall mean that the acts of the individual Defendant were done with the knowledge, consent, approval and ratification of the other Defendant and are thereby attributed to each Defendant individually, jointly and severally.

## PONZI SCHEME

6.     Martin Sigillito is an attorney who advertised that he had a solid track record of international investments with high rate or return. Martin Sigillito is also a bishop of the American Anglican Congregation and he used his religious connections, his legal credentials and his fraudulent investment record to defraud over 100 individuals of more than $45 million in a classic "ponzi scheme" where the purported returns were paid from funds contributed by new investors.

7.     Martin Sigillito organized, operated and masterminded a fraudulent loan program that induced individuals to loan money to an England based company,

Distinctive Properties (UK) Limited ("Distinctive Properties"), for purported land purchases in England. Martin Sigillito, and DOES 1 through 25 ("the co-defendants") falsely represented to the plaintiffs that Derek Smith, the owner of Distinctive Properties, had an excellent record of making money by optioning land and reselling the land for substantial profits.

8.      Martin Sigillito and the co-defendants falsely represented to each of the plaintiffs that Derek Smith is worth $53,637,500 and that he borrowed less than one half the value of the properties. The plaintiffs were also told stories of many successful loans and repayments and were promised anywhere from 16% to 23% annual return on their money for making a one year "asset line" based loan to Distinctive Properties, personally guaranteed by Derek Smith.

9.      Martin Sigillito and the co-defendants borrowed over $45 millions dollars in loans for Distinctive Properties. However, only $910,773.60 was sent to Distinctive Properties in England to purchase real estate. More than 98% of the $45 million was fraudulently diverted by Martin Sigillito and the co-defendants to their bank accounts and some of the money was diverted to private lenders and disguised as interest on the loan when in fact the money came from new loans confirming that the loans were a classic "ponzi scheme" from inception.

10.      Martin Sigillito, and the co-defendants, informed investors that all investments were performing as planned and that their loans were an "asset line"

based loan and that Derek Smith used the money from the loans to acquire land and options. Martin Sigillito, and the co-defendants, knew this to be false. They knew they would not send Derek Smith the loan money and they knew that in time the "ponzi scheme" would come crashing down and would in turn leave the plaintiffs/lenders with worthless loans.

11.     Every loan to Distinctive Properties that has been rolled over on the annual renewal of the previous loan is in default and each loan that has not yet been rolled over is also in default.

## PLAINTIFFS

12.     Phil Rosemann is an individual and citizen of Nevada, with business offices in St. Louis, Missouri ("Plaintiff"). Phil Rosemann made fifteen separate loans in 2007 to Distinctive Properties totaling **$15 million**.

13.     Hal and Jan Millsap are individuals and citizens of Arkansas with their home address of 6321 Tall Oaks Loop Street, Springdale, Arkansas 72762. They loaned **$87,000** to Distinctive Properties in July 2007.

14.     David and Diane Caldwell are individuals and citizens of Arkansas with their home address of 6120 Westminster, Benton, Arkansas 72015. They made seven loans to Distinctive Properties in 2007 totaling **$754,637**.

15.     William and Carol Phillips are individuals and citizens of Arkansas with their home address of 919 North 26th Street, Arkadelphia, Arkansas 71923. They made six separate loans to Distinctive Properties in 2007 totaling **$633,380**.

16.     Edward Chunglo is an individual and citizen of Arizona with a home address of 11075 East Oberlin Way, Scottsdale Arizona. He made three separate loans to Distinctive Properties totaling **$510,890**.

17.     Calvin Wright is an individual and citizen of Arizona with a home address of 107 East Grove, Mesa, Arizona 85210. He made one loan to Distinctive Properties on April 14, 2008 for **$492,625**.

18.     Stan Kuhlo is an individual and citizen of Missouri with a home address of 42 Woods Hill Drive, St. Charles, Missouri, 63303. He made five separate loans in 2009 to Distinctive Properties totaling **$482,717**.

19.     Paul and Margaret Fancher are individuals and citizens of Arkansas with their home address of 8277 Highway 143, Berryville, Arkansas 72616. They made three separate loans to Distinctive Properties totaling **$468,062**.

20.     Wanda and Carl Lavender are individuals and citizens of Arizona with their home address of 3005 South Shode Road, Bryant, Arizona 72022. They made five loans to Distinctive Properties totaling **$315,090**.

21.     William Gaylor is an individual and citizen of Ohio with his home address of 619 Glenway Drive, Hamilton, Ohio 45013. He made four loans to Distinctive Properties in 2007 totaling **$250,000**.

22.     Leonard Roman is an individual and citizen of Ohio with his home address of 7546 Norton Road, Hiram, Ohio 44234. He made one loan to Distinctive Properties on December 15, 2006 totaling **$180,056**.

23.   Frank and Helga Costello, are individuals and citizens of Michigan with their home address of 59788 Country Rd, Suite 681, Grand Junction, Michigan 49056. They made one loan on Feb 6, 2007 to Distinctive Properties for **$138,162**.

24.   Kenneth and Shirley Potgeter, 12036 56th Ave, Allondale, Michigan 49401. They made two loans to Distinctive Properties in 2007 totaling **$138,052**.

25.   Ronald Pastor is an individual and citizen of Michigan with his home address of 18885 Tall Timbers Drive, Howard City, Michigan 49329. He made two loans to Distinctive Properties in 2007 totaling **$105,215**.

26.   David Schultz is an individual and citizen of Michigan with his home address of 7905 Division Drive, Bailie Creek, Michigan 49014. He made one loan to Distinctive Properties on April 11, 2007 for **$100,276**.

27.   Brian Waffle is an individual and citizen of Michigan with his home address of 11605 Q. Drive South, Burlington, Michigan 49209. He made one loan to Distinctive Properties on October 20, 2007 for **$50,000**.

28.   Nina Blaylock is an individual and citizen of Arizona with her home address of 18200 Blaylock Road, Benton, Arizona 72015. She made one loan to Distinctive Properties on March 28, 2007 for **$33,000**.

### SPECIFIC FRAUDULENT REPRESENTATIONS

29.   Martin Sigillito and the co-defendants, falsely represented to each of the plaintiffs that their loan money was being borrowed by Distinctive Properties, to

purchase real estate in England, and that they would be repaid anywhere between 16% to 23% annual return on their money for making a one year "asset line" based loan to Distinctive Properties, personally guaranteed by Derek Smith. Martin Sigillito and the co-defendants knew that less than 2% of the loan money was actually being sent to England. More than 98% of the loan money was fraudulently diverted by Martin Sigillito, and the co-defendants, to their bank accounts. On May 8, 2010 Derek Smith sent an email to Martin Sigillito confirming that only $910,773.60 was sent to Derek Smith by Martin Sigillito since 2003.

30.    Martin Sigillito falsely represented to plaintiff Phil Rosemann that his $15 million loan made in January 2007 to Distinctive Properties would be used to purchase real estate in England. On May 8, 2010 plaintiff Phil Rosemann was sent an accounting showing that Derek Smith received a check for only $19,136.62 and that Martin Sigillito received over $2,700,541 in fees from Phil Rosemann's loan money.

31.    Martin Sigillito and the co-defendants, falsely represented to each of the plaintiffs that Distinctive Properties had an impeccable track record in real estate investments in England and that they had repaid many loans over the years on time and as promised. Martin Sigillito, and the co-defendants, knew that Distinctive Properties did not purchase or sell a single property from the plaintiff/lenders money and did not repay a single plaintiff/lender for loans they did not make. They also

knew that the few projects undertaken by Derek Smith had failed. For example, the Princess Hotel in Manchester and the Grand Hotel in Bexhill on Sea were in receivership.

32.    On April 5, 2010 Martin Sigillito sent an email to plaintiff Phil Rosemann fraudulently showing "a spreadsheet of payments made on behalf of Mr. Rosemann from Distinctive Properties (UK) Ltd. in 2009." Martin Sigillito knew that no such payments were made by Distinctive Properties since they only received $19,136.62 from the $15 million loan by Phil Rosemann.

33.    On April 7, 2010 Martin Sigillito sent another email to Phil Rosemann stating that he "arranged with Derek to make certain payments" to Phil Rosemann and "of those monies advanced, you will see that $410,000.00 was cash from me and/or my company and about $650,000 was borrowed on my corporate line of credit on Mr. Smith's behalf. The remaining $850,000 were money available to Mr. Smith from my Trust account." After fraudulently diverting $15 million from Phil Rosemann's money to his personal use, Martin Sigillito has the audacity to demand in his April 7, 2010 email "confirmation that I will be authorized to recoup the cash I have advanced, as noted above, plus the not insignificant expenses which have also been advanced." Martin Sigillito fraudulently diverts the money to his personal needs and then seeks reimbursement when the a small portion of the money is actually repaid.

There is no limit to the dishonesty to which Martin Sigillito will go to mask his fraudulent scheme.

34.     Martin Sigillito and the co-defendants, justified the substantial loans by falsely representing to each of the plaintiffs that the land options undertaken by Distinctive Properties were for very expensive properties worth tens of millions of dollars. However, Martin Sigillito, and the co-defendants, knew that the options cost very little and that the purchase price of the land was less than $1 million. The option paid for the Bracknell property which is viewed as the crown jewel of the investment scheme cost only $15,000. The cost of the option for the land in Audrey Head, or the land in Pewsey, cost only $1,500. On May 7, 2010 Derek Smith sent an email to Martin Sigillito confirming that the cost of all his land options since 2003 were only $175,000.

35.     On April 7, 2010 Martin Sigillito sent an email to Phil Rosemann asking him to dismiss the lawsuit against Derek Smith stating that "UK property developers, to an extent greater than is the case in North America, rely on the acquisition and trading of land options, and those (even more so than is the case with fee simple interest) would be subject to enormous evaluation discounts if were are forced to engage in what amount to a fire sale." Another email on that same date by Martin Sigillito stated "if this action appears on the public record on the wrong day, the refi will be dead, as you know, and months of work will have been wasted. That will do nothing but delay getting money into" Phil Rosemann's hands and "I am on the verge

of resolving a lot of issue here but am unable to do so without your help. You have my word that I will get this accomplished or die trying."

36.     Martin Sigillito, and the co-defendants, represented to each of the plaintiffs that Martin Sigillito would receive a small fee for making the loan directly from Distinctive Properties. However, Martin Sigillito, and the co-defendants, took fees in excess of 25% directly from the loans as finders fees for making the fraudulent loans. Martin Sigillito paid himself over $2 million in fees each of the past six years from the fraudulent loans. Some of the co-defendants also received substantial fees for inducing the plaintiffs in invest in the fraudulent scheme.

37.     Martin Sigillito and the co-defendants, falsely represented to each of the plaintiffs that the loan documents were signed by Derek Smith. However, Martin Sigillito was assembling these loan documents in the United States using copies of Derek Smith's signature from a loan made six years earlier. A review of all fifteen loans made from Phil Rosemann confirms that Derek Smith's signature is identical on each page. Martin Sigillito, and the co-defendants, falsely represented Derek Smith's involvement in "the program." While Derek Smith was aware of some of the loans, he was not aware of the volume of loans.

38.     Martin Sigillito stated in many emails that the loans were for Derek Smith. Martin Sigillito stated in an email to Phil Rosemann on April 7, 2010 that "Your fear that assets might be moved or hidden is unfounded. Mr. Smith is, as

guarantor, already 'on the hook' as an individual, not just a corporate borrower. He would not commit fraud."

39.     Martin Sigillito and the co-defendants, falsely represented to each of the plaintiffs in a letter that Martin Sigillito "along with a team of lawyers and accountants conduct constant due diligence on his borrowers. [Martin Sigillito] travels to the U.K almost monthly. The due diligence consists of constantly checking tax returns, looking at independent land appraisals, credit rating checks, balance sheet and income statement checks, etc. If an investor should want to speak with Marty regarding his due diligence process or seek additional documents, obtain the names of the appraisal firms, attorneys, etc that are used, he would be happy to share that information."

40.     The request for the existing "independent land appraisals" and the promise to happily "share that information" was side-stepped and so was the request for verification of what was purchased with Phil Rosemann's money. The verification of the assets owned by Derek Smith similarly fell of deaf ears.

(A).   On April 8, 2010 Martin Sigillito stated in an email to Phil Rosemann that his secretary "is gathering all loan documents and will coordinate" delivery and that the "background data requested is being put together" but delayed because "tax season is ending" and "it should be with you shortly. [Derek] Smith is also preparing a memo updating progress and status of projects."

(B).   On April 27, 2010 Martin Sigillito sent an email to Phil Rosemann stating "I am scheduled to meet with Derek (along with anyone else who may be necessary) on Thursday and Friday in order to bring together documents and data which will provide exactly that level of clarity to which all lenders are entitled, including my family and me. This will include documents relating to property and interests in property such as options and easements (both recorded and unrecorded, as is often the case in the UK), details with regard to planning permissions, whether obtained or still sought, valuations and data on use and flow of cash. I am still confident that all is as is should be and easily verifiable. I will do my very best to re-earn both your trust in the projects and your confidence in those involved. Again, I very much regret that I relied too long on others to get this done."

(C).   On April 30, 2005 Martin Sigillito sent an email stating that he "met with Derek" Smith and that "materials have been gathered which reflect property interests (both recorded and unrecorded) and planning situations (in various stages). I am off this afternoon to view a new and previously unseen (by me, that is) property, which is several hours outside of London. Derek [Smith] is working on a narrative which will cover the history of the various projects, valuation issues and projected timelines. . . . I will bring with me copies of all relevant documents when I return. . . . and will have everything, as promised, next week."

(D).   On May 5, 2010 Martin Sigillito sent an email to Phil Rosemann stating that "all documents related to land/options/planning have been gathered" and "copies of that material" are "on their way here for you" and the "financial data are being gathered from multiple sources and will be in [your] hands no later than next week."

(E).   On May 14, 2010 Martin Sigillito sent an email to Phil Rosemann stating that "Disclosure of assets is not a problem (once I get back). A significant percentage is in Distinctive. Monies to buy out can't come from us--we are heavily invested in Distinctive. See my note to Scott to follow re: disclosure. We can show, without divulging confidential date, what is owed to others."

(F).   On May 19, 2010 Martin Sigillito sent an email to Phil Rosemann stating that "my refunding efforts have borne fruit here in the middle east. I have some very likely sources who are on the verge. I am told that I will have decisions shortly. The other thing we are working on is the marketing of some property interests. I will have a time line for that soon. I know the urgency of the need for cash (I am in the same position, as you know.) I am doing my best to have some hard data on all of this as soon as possible. Nothing has higher priority."

41.    Martin Sigillito and the co-defendants, falsely represented to each of the plaintiffs in a letter that Martin Sigillito "always encourage those with an interest to seek outside British counsel and appraisal to do their own due diligence. We encourage you to ask for any additional documentation as well. We believe in

complete transparency. In addition, if you wish to go to the U.K. we would be happy to meet you there and introduce you to Derek as well as walk the various properties." When Phil Rosemann asked for Derek Smith's email so that he could communicate directly the request fell on deaf ears. When asked for Derek Smith to meet his attorney in England, it was denied because "Derek would not know what to say."

42.    After repeated demands on May 5, 2010 Phil Rosemann's attorney in England met with Derek Smith and he stated that he was aware that Martin Sigillito was obtaining money by way of private loans for him to purchase real estate. Derek Smith also stated that he received very little money that was promised and that he was bankrolling the real estate purchases by remortgaging his home. Derek Smith also confirmed that Distinctive Properties Limited is a shelf company which has never traded and that its bank account statements will show that it never received any of the funds which were lent to Distinctive Properties under the agreements arranged by Martin Sigillito and the co-defendants.

43.    Martin Sigillito and the co-defendants, represented to each of the plaintiffs that Derek Smith had a net worth of $53,637,500 at the time of each loan. However, Martin Sigillito, and the co-defendants, knew that Derek Smith is practically bankrupt. Martin Sigillito and the co-defendants, falsely represented to each of the plaintiffs specific details that Derek Smith had a net worth of $53,637,500 at the time of each loan and attached a list of Derek Smith's assets to the loans in order to induce the plaintiffs to make the loan. However, Martin Sigillito, and the co-

defendants, knew that the list of assets attached to the loans were fraudulent. For example, they knew that the purchase price for the Little Farm Nursery is only $262,500 but instead listed the nursery as having a value of $15 million. The 5,714% increase in value was hidden from the plaintiffs along with the fact that Derek Smith only owns an option on the Little Farm Nursery which he paid a paltry $7,500.

44.     Martin Sigillito and the co-defendants, falsely represented to each of the Plaintiffs that Derek Smith was able to cover the loans by buying and selling land options and that he could cover the costs of loans from cash flow produced by the Hinton Grange and the Little Farm Nursery. However, Martin Sigillito knew that the Little Farm Nursery was abandoned and did not produced any cash flow, and they also knew that the hotel was operating in the negative and could not provide any cash flow for the loans.

45.     Martin Sigillito and the co-defendants, falsely represented to each of the Plaintiffs that Derek Smith's personal asset to liability ratio is 2:1 and he borrows less than one half of a properties value. However, Martin Sigillito, and the co-defendants, knew that Derek Smith has an asset to liability ratio close to 1:1 which means that few the properties that he owns are purchased completely with borrowed money.

46.     Martin Sigillito and the his co-defendants, falsely represented to each of the Plaintiffs that if Distinctive Properties and Derek Smith defaulted on a note they could obtain a judgment against Derek Smith's and seize and sell his personal assets and that their money along with accrued interest would be returned within three

months of the default. Martin Sigillito, and the co-defendants, knew that since Derek Smith did not receive the loan money, any lawsuit would not result in the return of the money that was purportedly loaned to Derek Smith.

47.    On March 22, 2010 Phil Rosmeann filed a lawsuit against Derek Smith in this court, case no 4:10-cv-00480. Instead of seeking the return of the investment, Martin Sigillito attempted through numerous emails to have the lawsuit dismissed and stated in an email on April 7, 2010 to Phil Rosemann that "For some months, I have worked intensively on a partial but significant refinancing of Smith's debt. That effort is now in great jeopardy because of this litigation that now appears on the public record. The quickest way for the present matter to be resolved would be to have the instant case dismissed . . . . Litigation, at this point, is not the best means to ensure as prompt and complete a payment as can be realized via the method I have been working on [more fraudulent loans]." On April 8, 2010 Martin Sigillito stated in an email to Phil Rosemann that "one of several partial refi commitments has been withdrawn, apparently as a result of the instant case having been filed. The purpose of my trip will be to see if I bring this back to life; I do not know whether I can. This would have provided more than enough, by itself, to have settled this particular claim and more. There are three other such deals pending."

48.    Martin Sigillito and the co-defendants, used many false means to prevent the plaintiffs from investigating the loans. They falsely represented to the plaintiffs

that options in land are not recorded in England which uses a unique method of not recording land deeds. However, Martin Sigillito and the co-defendants, knew this to be false and made the false statements to prevent the Plaintiffs from investigating the properties purportedly owned by Derek Smith, or if they did investigate to explain why the properties were not listed as being owned by Derek Smith.

49.     Martin Sigillito and the co-defendants, have not ended their conspiracy and after all the loans were in default, on March 2, 2010 Martin Sigillito executed a fradulent note with Mark and Cindy Merlotti for $300,000. Martin Sigillito, continued the same fraudulent statements identified above and he also failed to disclose to the Merlotti's that more than $45 million in loans were in default at the time of the loan.

50.     After the FBI served a search warrant on his office, Martin Sigillito sent an email through his attorney asserting that everyone would get repaid. Neither he, nor his attorney, explain from whom, since he did not send the money to the lender (Distinctive Properties) as he represented.

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)

51.     The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, provides a private civil action to recover treble damages for "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

52.     18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . ."

53.     The definitional section of RICO defines a "pattern of racketeering activity" as requiring "at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5).

54.     Racketeering activity is defined in 18 U.S.C. § 1961(1)(A)-(B) to include mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

## THE RACKETEERING DEFENDANTS

55.     18 U.S.C. § 1962(c) makes it unlawful for "any person" to conduct or participate, directly or indirectly, in the conduct of an enterprise through a pattern of racketeering activity. The definitional section of RICO defines a "person" as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

56.     Defendants Martin Sigillito organized, operated and mastermind a fraudulent loan program identified above.

57.     The acts of any Defendant acting individually, were done with the knowledge, consent, approval and ratification of the other Defendants and are thereby attributed to the Defendants individually, jointly and severally.

58.    The Defendants are separate, culpable parties who benefitted individually and collectively, either directly or indirectly, from the pattern of racketeering activity over a period of more than seven years.

59.    Each and every act of the Defendants was motivated by evil intent, or reckless or callous indifference to the rights of the Plaintiffs. Each of the Defendants was in some manner proximately responsible for the events and happenings alleged in this complaint and for the Plaintiffs injuries and damages.

60.    Each and every act of the Defendants was done for personal gain, self interest and for personal benefit.

61.    Defendants conducted and participated, directly and indirectly, in the affairs of Distinctive Properties through a pattern of racketeering activity, over a period of more than seven years and are thereby considered persons (infiltrating racketeers) within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

## DISTINCTIVE PROPERTIES IS A RICO ENTERPRISE

62.    18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. The definitional section of RICO defines "enterprise" as "any individual, partnership, corporation, or other legal entity." 18 U.S.C. 1961(4).

63.    Distinctive Properties (UK) Limited is engaged in many commercial ventures and obtained the loans from some of these from the United States and they are the direct or indirect beneficiary of the racketeering activity.

64.    Distinctive Properties is an enterprise affecting interstate commerce within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68.

## DEFENDANTS COMMITTED MULTIPLE RACKETEERING ACTS OF MAIL AND WIRE FRAUD

65.    18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. The definitional section of the RICO 18 U.S.C. § 1961(1)(B) provides that mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343, is "racketeering activity" and considered a RICO violation.

66.    The mail fraud statute, 18 U.S.C. § 1341, prohibits a broad range of activity by anyone who "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" and "for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service."

67.    Martin Sigillito and the co-defendants mailed **over five hundred letters** during the past seven years to the Plaintiffs with copies of loan documents by United

State mail in furtherance of their scheme to defraud the plaintiffs in violation of 18 U.S.C. § 1341.

68.     Martin Sigillito and the co-defendants also sent by Federal Express well **over five hundred packages** with copies of loan documents to the Plaintiffs during the past seven years in furtherance of their scheme to defraud the Plaintiffs in violation of 18 U.S.C. § 1341.

69.     Martin Sigillito and the co-defendants mailed **over five hundred letters** to the Plaintiffs by United States Mail with either checks for interest payments or checks for loan repayments during the past seven years in furtherance of their scheme to defraud the Plaintiffs in violation of 18 U.S.C. § 1341.

70.     The wire fraud statute, 18 U.S.C. § 1344, also prohibits a broad range of activity by anyone "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire" in interstate commerce "any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme."

71.     Defendant Martin Sigillito sent **over five hundred interstate faxes** with copies of the plaintiffs loan documents during the past seven years from his St. Louis office to the Plaintiffs homes in Arizona, Arkansas, Michigan and Ohio and each fax was sent in order to advance the defendants scheme to defraud the Plaintiffs in violation of 18 U.S.C. § 1343.

72.     Defendant Martin Sigillito and the co-defendants send well **over five hundred interstate faxes** to Scott Brown in Kansas and to Derek Smith in England during the past seven years as their regular means of communication all in furtherance of advancing the scheme to defraud the Plaintiffs in violation of 18 U.S.C. § 1343.

73.     Defendant Martin Sigillito and the co-defendants **telephoned** the Plaintiffs many times during the past seven years for an accumulated total of more than **five hundred interstate telephone calls** all made with interstate electronic communication in furtherance of the Defendants scheme to defraud the plaintiffs in violation of 18 U.S.C. § 1343.

74.     Defendant Martin Sigillito and the co-defendants communicated with Scott Brown in Kansas and with Derek Smith in England by telephone as a regular means of advancing the scheme to defraud the Plaintiffs and each of the more than **one thousand interstate telephone calls** by Martin Sigillito and the co-defendants used interstate electronic communication in furtherance of their scheme to defraud the Plaintiffs in violation of 18 U.S.C. § 1343.

75.     Defendant Martin Sigillito and the co-defendants sent well over **five hundred emails** to the Plaintiffs during the past seven years (the specifics of a few of these emails is described above) and each **email** message used interstate electronic communication in order to advance the Defendants scheme to defraud the Plaintiffs in violation of 18 U.S.C. § 1343.

76.   Defendant Martin Sigillito and the co-defendants communicated with Scott Brown in Kansas and with Derek Smith in England by email as a regular means of advancing their fraudulent scheme and each of the **email** messages sent by the Defendants used interstate electronic communication in furtherance of their scheme to defraud in violation of 18 U.S.C. § 1343.

77.   Defendant Martin Sigillito and the co-defendants sent and received well over **five hundred electronic money wire transfers** to the Plaintiffs and to each other during the past seven years and each **wire transfer** used interstate electronic communication in order to advance the Defendants scheme to defraud the Plaintiffs in violation of 18 U.S.C. § 1343.

78.   The Defendants committed well **over two thousand separate acts of mail and wire fraud** in furtherance of their fraudulent scheme in violation of 18 U.S.C. §§ 1341, 1343. The mail or wire communication related to their fraudulent scheme and was incident to an essential part of the scheme, and involved many misrepresentations reasonably calculated to deceive the Plaintiffs. Each time a letter, fax, phone call, email or wire transfer was sent it deprived, or attempted to deprive, the Plaintiffs of their money and resulted in a distinct injury to the Plaintiffs and a concommitant benefit to the Defendants.

## DEFENDANTS PATTERN OF RACKETEERING ACTIVITY

79.   18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a "pattern of racketeering activity" which is defined as "at least two acts of

racketeering activity" within ten years. 18 U.S.C. § 1961(5). Mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343 are considered "racketeering activity."

80.     For the past seven years the Defendants committed multiple acts of mail and wire fraud against the Plaintiffs in violation of 18 U.S.C. §§ 1941, 1943. Each act of mail fraud and wire fraud constitutes separate instances of **interrelated racketeering activity**.

81.     The Defendants racketeering activity threatens to continue unabated, driven by the possibility of repeated economic gain, and the ability to invest the racketeering income back into the enterprise. The acts of mail fraud and wire fraud escalated confirming that the Defendants have no intention of stopping the racketeering activity which by it's very nature is projected into the future with a threat of repetition. Unless restrained by this court, the practice is likely to continue unabated for years.

## THE PLAINTIFFS RACKETEERING INJURY

82.     The injury to the Plaintiffs business or property was proximately caused by the Defendants pattern of racketeering activity. Each act of mail or wire fraud injured the Plaintiffs business or property and represents a discrete attempt to injure the Plaintiffs and had little to do with the previous or subsequent act of extortion.

83.    As a direct and proximate cause of the Defendants actions in violation of 18 U.S.C. § 1962(c) the Plaintiffs have been and continue to be injured in their business or property within the meaning of 18 U.S.C. § 1964(c) in an amount to be determined upon trial of this action, which amount exceeds Thirty Million Dollars ($30,000,000) and the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

WHEREFORE, Plaintiffs pray for judgement against defendant Martin Sigillito and DOES 1 through 25 each of them individually, jointly and severally as follows:

(A).    For damages against the Defendants, each of them individually, jointly and severally in an amount to be determined upon trial of this action, which amount exceeds Thirty Million Dollars ($30,000,000) and the sum duly trebled in accordance with 18 U.S.C. § 1964(c); and

(B).    For costs of this suit including reasonable attorneys fees in accordance with 18 U.S.C. § 1964(c); and

(C).    For such other and further relief this court may deem just and proper.

## COUNT 2
## CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)

COMES NOW Plaintiffs and for their complaint for violation of 18 U.S.C. § 1962(d) against Martin Sigillito and DOES 26 through 50, each of them individually, jointly and severally state as follows:

84.    The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

85.    Martin Sigillito and the co-defendants borrowed over $45 millions dollars in loans for Distinctive Properties but instead diverted the money to others, like Swinburne and Jackson who on January 17, 2007 fraudulently received $2,569,351.26 of Phil Rosemann's loan. The defendants who received this money, either knew, or should have known, that they money was fraudulently obtained and while the Plaintiffs are presently ignorant of the true names and capacities of these defendants and sue them as **DOES 26 through 50 inclusive**, and therefore sue these defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.

86.    Plaintiffs are informed and believe and on that basis allege that each of the fictitiously named defendants  was agent, servant or employee of each remaining defendant and was acting within the purpose, scope, course and authority of such agency and employment, and are legally responsible in some manner for the occurrences alleged in this complaint, and that plaintiffs' damages or losses were proximately caused by the fictitiously named DOE defendants.

87.    Plaintiffs are informed and believe and on that basis allege that the defendants' actions and conduct as alleged herein were at all times known to the officers, directors, executives, supervisors, managers, general partners, and authorized agents of the each of the defendants, but the defendants nevertheless engaged in such

conduct, and further, each defendant knowingly, intelligently and intentionally permitted and acquiesced in such conduct on the part of each other defendant, and the employees, servants and agents of each other defendant. Plaintiffs are further informed and believe and on that basis allege that the defendants had advance knowledge of the unfitness of defendants' decision-makers, but employed and continued to employ such decision-makers with a conscious disregard for the rights and safety of the plaintiffs.

88.    18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(d) makes it "unlawful to conspire to violate [18 U.S.C. § 1962(c)]." Hence, 18 U.S.C. § 1962(d) makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity.

89.    The Defendants conspired and agreed with each other to engage in the conduct, or attempted conduct stated above, and also conspired and agreed to aid each other in the commission of the acts of extortion, or of an attempt to commit extortion, as stated above.

90.    The Defendants conspired, planned and schemed to use Distinctive Properties as a racketeering enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

91.     The Defendants agreed to conduct or participate in the affairs of Distinctive Properties and agreed to commit acts of extortion, as their regular way of conducting Distinctive Properties affairs, by demanding unlawful exactions (impact fees, land and improvements) as a condition of development approval, under color of official right.

92.     The Defendants conspired to violate 18 U.S.C. § 1962(c) by conducting the affairs of Distinctive Properties through a pattern of racketeering activity, by committing multiple acts of mail and wire fraud.

93.     Each of the Defendants combined, conspired and confederated with each other to commit a pattern of racketeering activity, and thereby violated 18 U.S.C. § 1962(d) by conspiracy to violate 18 U.S.C. § 1962(c).

94.     As a direct and proximate cause of the Defendants actions in violation of 18 U.S.C. § 1962(d) the Plaintiffs have been and continue to be injured in their business or property within the meaning of 18 U.S.C. § 1964(d) in an amount to be determined upon trial of this action, which amount exceeds Thirty Million Dollars ($30,000,000) and the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

WHEREFORE, Plaintiffs pray for judgement against defendant Martin Sigillito and DOES 26 through 50, each of them individually, jointly and severally as follows:

(A).    For damages against Martin Sigillito and DOES 26 through 50, each of them individually in an amount to be determined upon trial of this action, which

amount exceeds Thirty Million Dollars ($30,000,000) and the sum duly trebled

in accordance with 18 U.S.C. § 1964(c); and

(B).   For costs of this suit including reasonable attorneys fees in accordance with 18

U.S.C. § 1964(c); and

(C).   For such other and further relief this court may deem just and proper.


PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.


Sebastian Rucci (Eastern Dist Reg. No. 76207)
LAW OFFICES OF SEBASTIAN RUCCI
401 E. Ocean Blvd., Suite 200
Long Beach, CA 90802-4993
Tel:   (562) 901-0199
Fax:   (562) 901-0599
Cell:   (330) 720-0398
Email: SebRucci@gmail.com
Attorney for Plaintiffs