IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PHILLIP L. ROSEMANN et al.,

    Plaintiffs,

vs.

MARTIN T. SIGILLITO et al.,

    Defendants.

No. 10-CV-1165-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.      **INTRODUCTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **RELEVANT PROCEDURAL HISTORY.** . . . . . . . . . . . . . . . . . . . . **2**

      *A.*    *Enterprise's Motion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
      *B.*    *Plaintiffs' Motion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

III.   **SUBJECT MATTER JURISDICTION.** . . . . . . . . . . . . . . . . . . . . . **5**

IV.   **SUMMARY JUDGMENT STANDARD.** . . . . . . . . . . . . . . . . . . . . **6**

V.    **FACTUAL BACKGROUND.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

      *A.*    *Parties.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
      *B.*    *Alleged "Ponzi Scheme".* . . . . . . . . . . . . . . . . . . . . . . . . . **8**
      *C.*    *Enterprise's Role in the Scheme.* . . . . . . . . . . . . . . . . . . . **8**
      *D.*    *Collapse of the BLP.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

VI.   *ANALYSIS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

      *A.*    *Count I.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
            *1.*    *Violation of RICO, 18 U.S.C. § 1962(c).* . . . . . . . . . . . . . **16**
            *2.*    *Existence of an enterprise.* . . . . . . . . . . . . . . . . . . . . . **17**
                 *a.*    *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
                 *b.*    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**
            *3.*    *Conduct in association with the enterprise.* . . . . . . . . . . . **21**
                 *a.*    *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . . **21**
                 *b.*    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**
            *4.*    *Summary.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

B.    *Count II.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**
    1.    *Conspiracy to violate RICO, 18 U.S.C. § 1962(d).* . . . . . . . . **29**
    2.    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**
C.    *Count III.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**
    1.    *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**
        a.    *Causation requirement.* . . . . . . . . . . . . . . . . . . . . **32**
        b.    *General contract interpretation principles.* . . . . . . . . . **33**
    2.    *Enterprise's Motion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**
        a.    *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . . . **34**
        b.    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . **35**
    3.    *Plaintiffs' Motion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **39**
        a.    *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . . . **39**
        b.    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . **40**
D.    *Count IV.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**
    1.    *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**
    2.    *Enterprise's Motion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **44**
        a.    *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . . . **44**
        b.    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . **45**
    3.    *Plaintiffs' Motion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **47**
        a.    *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . . . **47**
        b.    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . **48**

VII.    *CONCLUSION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **48**

## *I.  INTRODUCTION*

The matters before the court are Defendant Enterprise Bank & Trust's ("Enterprise") "Motion for Summary Judgment" ("Enterprise's Motion") (docket no. 614) and Plaintiffs' "Motion for Partial Summary Judgment on Counts [III] and [IV] against Enterprise" ("Plaintiffs' Motion") (docket no. 626).

## *II.  RELEVANT PROCEDURAL HISTORY*

On October 11, 2012, seventy[1] Plaintiffs filed a Corrected Third Amended

---

[1] The Corrected Third Amended Complaint lists seventy-two Plaintiffs. However, two Plaintiffs, Preston Amos and Stuart Whittaker, were added to the Complaint after the deadline set forth in the Case Management Order (docket no. 349). Therefore, the court struck them from the Complaint. *See* Order (docket no. 479) at 1.

Complaint ("Complaint") (docket no. 456) against thirteen Defendants,[2] including Enterprise. Relevant to the Motions are Counts I through IV against Enterprise. Count I of the Complaint alleges that Enterprise violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). Count II of the Complaint alleges that Enterprise conspired to violate RICO, 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). Count III of the Complaint alleges breach of contract against Enterprise. Count IV of the Complaint alleges negligence against Enterprise. All Plaintiffs assert Counts I and II against Enterprise. However, only forty-one Plaintiffs maintained a self-directed Individual Retirement Account ("IRA") with Enterprise. Thus, only forty-one of the Plaintiffs assert Counts III and IV against Enterprise.[3] *See* Stipulation of Plaintiffs on Counts III and IV (docket no. 532).

### A. *Enterprise's Motion*

On April 21, 2013, Enterprise filed Enterprise's Motion. On that same date, Enterprise filed a Brief in Support of Enterprise's Motion (docket no. 615) and a Statement

---

[2] Of the thirteen Defendants listed in the Complaint, only Enterprise and Martin T. Sigillito remain parties in the action.

[3] The court notes that the Stipulation of Plaintiffs on Counts III and IV dismissed the claims of twenty-six Plaintiffs other than Preston Amos and Stuart Whittaker, who the court had already dismissed. In the Statement of Material Facts in Support of Enterprise's Motion, Enterprise claims that Bonita Cobb, Barbara Currier and William McLemore did not maintain self-directed IRAs with Enterprise. Statement of Material Facts in Support of Enterprise's Motion (docket no. 616) at 1-2. Plaintiffs do not dispute this fact. Therefore, the court shall dismiss Bonita Cobb, Barbara Currier and McLemore from Counts III and IV against Enterprise. Thus, there are forty-one Plaintiffs asserting claims against Enterprise in Counts III and IV. In addition, Enterprise asserts that Mary Winterhof did not maintain an IRA account with Enterprise and, thus, does not have a claim against Enterprise in Counts III and IV. Resistance to Plaintiffs' Motion (docket no. 650) at 7 n.9. However, the court does not have enough evidence at this point to find that Mary Winterhof cannot assert claims in Counts III and IV against Enterprise and, thus, will continue to count her among the Plaintiffs asserting such claims.

of Material Facts in Support of Enterprise's Motion. On May 13, 2013, Plaintiffs filed a Resistance to Enterprise's Motion (docket no. 649).[4] Plaintiffs did not file a response to the Statement of Material Facts in Support of Enterprise's Motion and did not file a statement of material facts to support their Resistance to Enterprise's Motion.[5] Rather, Plaintiffs state in the Resistance to Enterprise's Motion that "there is a genuine dispute with conclusory facts [five] through [eight]." Resistance to Enterprise's Motion at 7. Plaintiffs do not contest any other facts.

---

[4] The court notes that the Resistance to Enterprise's Motion is thirty-seven pages long. Under Local Rule 4.01(D), "[n]o party shall file any . . . brief which exceeds fifteen (15) numbered pages . . . without leave of [c]ourt." E.D.Mo. L.R. 4.01(D). Plaintiffs did not request leave of court to file an over length brief. Nevertheless, the court shall consider Plaintiffs' arguments in the Resistance to Enterprise's Motion in considering Enterprise's Motion.

[5] Plaintiffs have, once again, failed to comply with the Local Rules and the Federal Rules of Civil Procedure after repeated notice from the court that such disregard for procedural rules will not be tolerated. Local Rule 4.01(E) provides that:

> Every memorandum in opposition [to a motion for summary judgment] shall include a statement of material facts as to which the party contends a genuine issue exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

E.D.Mo. L.R. 4.01(E); *see also* Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it.").

Given the court's repeated emphasis on following the relevant procedural rules, the court shall consider all of the facts set forth in the Statement of Material Facts in Support of Enterprise's Motion to be undisputed when addressing the merits of the claims.

## B. Plaintiffs' Motion

On April 24, 2013, Plaintiffs filed Plaintiffs' Motion. That same date, Plaintiffs filed a Statement of Material Facts in Support of Plaintiffs' Motion (docket no. 627). On April 25, 2013, Plaintiffs filed a Brief in Support of Plaintiffs' Motion (docket no. 628).[6] On May 15, 2013, Enterprise filed a Resistance to Plaintiffs' Motion. On that same date, Enterprise filed a Response to Plaintiffs' Statement of Material Facts in Support of Plaintiffs' Motion (docket no. 651) and an Additional Statement of Material Facts in Response to Plaintiffs' Motion (docket no. 652). On May 16, 2013, Plaintiffs filed a Reply to Enterprise's Resistance to Plaintiffs' Motion (docket no. 653).

## III. SUBJECT MATTER JURISDICTION

The court has federal question jurisdiction over Plaintiffs' claims against Enterprise in Counts I and II, which arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c)-1962(d). *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

The court has supplemental jurisdiction over Plaintiffs' state-law breach of contract claim in Count III and negligence claim in Count IV because they are so related to the claims over which the court has federal question jurisdiction that they form part of the same case or controversy. *See* 28 U.S.C. § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ."). In other words, "[t]he federal-law claims and state-law claims in the case derive

---

[6] The court notes that the Brief in Support of Plaintiffs' Motion is thirty-nine pages long, which is in excess of the length permitted under the Local Rules without leave of court. Again, Plaintiffs failed to request leave of court to file such over length brief. Nevertheless, the court shall consider Plaintiffs' arguments in the Brief in Support of Plaintiffs' Motion.

from a common nucleus of operative fact and are such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 77 F.3d 1063, 1067 (8th Cir. 1996) (alteration in original) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988)) (internal quotation marks omitted).

## IV.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)), *cert. denied*, 132 S. Ct. 1144 (2012).  "[S]elf-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010).  "To survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second alteration in original) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)) (internal quotation marks omitted).  The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences.  *See Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011).

## V.  FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to the nonmoving parties and affording them all reasonable inferences, the uncontested material facts are as follows.

### A.  Parties

The Complaint names thirteen Defendants: (1) Martin T. Sigillito, an attorney,

American Anglican Bishop and Missouri citizen who did business as Martin T. Sigillito & Associates, Ltd. ("Martin Sigillito & Associates"); (2) Paul Vogel, an accountant, attorney, former President and CEO of Enterprise Bank & Trust's Trust Department and Missouri citizen; (3) Enterprise Bank & Trust, a Missouri corporation and subsidiary of Enterprise Financial Services Corp.; (4) James Scott Brown, an attorney and Kansas citizen who did business as the British American Group, Inc., a Kansas corporation; (5) Metis Insaat ve Ticaret A.S. ("Metis"), a Turkish company; (6) Swinburne & Jackson, a law firm with offices in England; (7) Metis Holding A.S., a Turkish company and principal shareholder of Metis Insaat ve Ticaret A.S.; (8) Veysel Sever, a resident of Turkey and shareholder and officer of Metis Insaat ve Ticaret A.S.; (9) Ayse Sever, a resident of Turkey and shareholder and officer of Metis Insaat ve Ticaret A.S.; (10) Fatma Nese Özdemir, a resident of Turkey and shareholder and officer of Metis Insaat ve Ticaret A.S.; (11) Levent Rifki Sever, a resident of Turkey and shareholder and officer of Metis Insaat ve Ticaret A.S.; (12) Bedri Sever, a resident of Turkey and shareholder and officer of Metis Insaat ve Ticaret A.S.; and (13) M&M Financial Investors, LLC, an Ohio limited liability company.

The only remaining Defendants in this action are Enterprise and Sigillito.[7] Derek Smith, a nonparty in this action, is a real estate developer in England. Smith owns Distinctive Properties (UK) Limited ("Distinctive Properties"), which is also a nonparty. Counts 1 and 2 are brought by sixty-nine individuals who are citizens of various states and one company, Braithwaite Consulting Limited ("Braithwaite"). Counts 3 and 4 are brought by forty-one individuals who maintained a self-directed IRA with Enterprise. Plaintiffs are not a certified class and each Plaintiff is bringing the claims against Enterprise in his or her individual capacity.

---

[7] The court has dismissed Defendants Vogel, Brown, Metis, Swinburne & Jackson, Metis Holding A.S., Veysel Sever, Ayse Sever, Fatma Nese Özdemir, Levent Rifki Sever, Bedri Sever and M&M Financial Investors, LLC from the instant action.

### B. Alleged "Ponzi Scheme"

Sigillito and others organized and operated a fraudulent loan program called the British Lending Program ("BLP") in which individuals, including Plaintiffs, loaned money to Smith and Distinctive Properties for purported land purchases in England. Sigillito and others attracted lenders "with written marketing materials which misrepresented the quality of the investment and the destination of loan funds, which were represented to be invested in land options in England." Complaint ¶ 10. As part of the BLP, the lenders entered into loan agreements whereby they lent money to Distinctive Properties, which is listed as the borrower in the loan agreements. Smith is listed as the surety in the loan agreements. Each loan agreement included an "Asset & Liability Statement," which the loan agreements warranted as "a true, accurate and current statement of [Smith's] assets and liabilities." *Id.* ¶ 51. However, the Asset & Liability Statements significantly overstated Smith's assets and understated his liabilities.

The BLP "operated as a classic Ponzi scheme in which loan payments were paid from new loans." *Id.* ¶ 14 (emphasis omitted). Over one hundred individuals loaned a total of approximately $52.5 million to the BLP. "Defendants only transferred $1.15 million of this amount to . . . Smith for purported investments." *Id.* Self-directed IRAs were the main source of BLP funds. Sigillito and others "targeted these IRAs because they tend[] to be renewed (rolled over) each year and the account holders would not ask for the money until retirement." *Id.* ¶ 12.

### C. Enterprise's Role in the Scheme

Self-directed IRAs, which were a primary source of funding for the BLP, require "a qualified custodian to hold IRA assets on behalf of the account holder." *Id.* ¶ 86. "IRA custodians maintain the assets and all corresponding transactions and records, file required [Internal Revenue Service] reports, issue client statements, and assist clients in understanding the rules and regulations pertaining to certain prohibited transactions." *Id.* From December 2001 until summer of 2008, Millennium Trust Company, LLC

("Millennium") served as the custodian for the IRAs invested with the BLP. In the spring of 2008, Vogel became involved with the BLP and began marketing BLP loans in return for fees. Later that year, Vogel secured the transfer of all IRA loans from Millennium to Enterprise, making Enterprise the custodian of the IRA loans invested with the BLP. Marti Gurley served as the Vice President and Trust Counsel at Enterprise until 2009, when she became a Senior Vice President. Gurley was designated to be in charge of compliance at Enterprise sometime in 2011 and ran Enterprise's Compliance Committee. Rick Blume was the account manager at Enterprise for all BLP loans until the summer of 2009, when Dana Muskoph took over the accounts. Liz Brahm is the Assistant Vice President of Trust Operations at Enterprise.

"Enterprise commenced their custodial relationship" with the individual IRA lenders ("Customers") "with a Custody Agreement." *Id.* ¶ 117. The Custody Agreements include the following language:

### 1. Safekeeping

Enterprise . . . agrees to hold and keep safely all securities and other property (hereinafter "Assets") which Customer shall elect to deposit in the Account and which are acceptable to Enterprise . . . , or which may be acquired or collected for or otherwise added to this Account (and then only as expressly provided herein), and thereafter shall be responsible for such Assets only until such time as they have been transmitted to and received by another person or entity pursuant to the terms of this Agreement or Instructions as defined in Section 11, hereof.

. . . .

### 4. Distributions

Enterprise . . . shall make distributions from the Account as directed, in writing, by customers.

Enterprise . . . may charge the Account an amount that will cover all related charges, but not limited to, wire charges, postage and other such items relating to processing the distributions.  In addition, if such distributions result in an overdraft in the account, Enterprise . . . reserves the right to offset such deficiency against the existing assets in the account in any manner deemed appropriate by Enterprise . . . .

## 5.  Purchases and Sales

On the receipt of Instructions, Enterprise . . . shall purchase additional securities in the Account, and shall charge the Account an amount that will cover the cost of the securities purchased plus all related charges, but not limited to, brokerage commissions, wire charges, postage, and other such items.  Such payment shall be made only upon receipt by Enterprise . . . of the securities so purchased in such form as is satisfactory to Enterprise . . . .

If upon settlement of the trade(s) an overdraft is created in the Account, Enterprise . . . reserves the right to offset such deficiency against the existing assets in the account in any manner deemed appropriate by Enterprise . . . .

On the receipt of Instructions, Enterprise . . . shall deliver or cause to be delivered securities sold by or from the Account to the broker or other person specified in the Instructions.  Such delivery shall be made only upon receipt of payment therefore in such form as is satisfactory to Enterprise . . . , with the understanding that Enterprise . . . may deliver securities or cause them to be delivered and arrange for payment therefore in accordance with the customs then prevailing among dealers in securities.

. . . .

## 9.  Instructions

As used herein, the term "Instructions" shall mean written . . . or oral . . . Instructions to Enterprise . . . which Enterprise

. . . reasonably believes to have been transmitted by the Customer or any Investment Advisor designated in Section 26, hereof. No later than the next business day immediately following each oral Instruction, the Customer or Investment Advisor giving that oral Instruction shall send to Enterprise . . . written confirmation of such oral Instruction, but the lack of such confirmation shall in no way affect Enterprise['s] . . . authority to act upon such oral Instruction or invalidate any actions taken by Enterprise . . . in reliance upon such oral Instruction. Enterprise . . . shall be protected and shall be indemnified and held harmless by Customer in executing any instructions hereunder.

. . . .

## 11. No Duty to Provide Investment Advice

Enterprise . . . will provide custodial services only and has no duty to provide investment advice. Enterprise . . . is not responsible for investment performance and does not guarantee that investment losses will not occur in the Account. It is expressly agreed that Enterprise . . . has no obligation to advise or recommend to Customer the purchase, retention, sale, exchange, or otherwise of any Assets at any time.

## 12. Standard of Care

In the absence of gross negligence or willful misconduct on its part, Enterprise . . . shall not be liable to the Customer or any other person with respect to any action taken or omitted by it in connection with the Agreement. In no event shall Enterprise . . . be liable for attorney's fees or for consequential or punitive damages.

Enterprise . . . shall not be responsible for any loss occasioned by the actions, omissions, defaults, or insolvency of any investment advisor, broker, bank, trust company, or any other person with whom Customer may deal, so long as Enterprise . . . has not engaged in gross negligence or willful misconduct. Enterprise . . . shall not be responsible for losses resulting

from events beyond its control, such as strikes, lockouts or labor disputes, riots, war, equipment or transmission failure or damage, fire, flood, earthquake, windstorm or other natural disaster, action or inaction of governmental authority, or other causes beyond its control.

. . . .

## 20. Missouri Law Controlling

This Agreement shall be governed by the laws of the State of Missouri.

. . . .

## 26. Designation of Broker or Investment Advisor

**(Optional)** Enterprise . . . is directed to accept and to rely fully upon all Instructions with respect to the purchase and sale of, and other transactions in securities, given by _____ (hereinafter "Investment Advisor"), with the brokerage firm of Investment Advisor's choosing, and no further authorization by Customer shall be required. Therefore, Enterprise . . . shall have no liability as a result of following such instructions.

Thomas Currier Custody Agreement (docket no. 456-12) at 1, 2, 3-4, 5, 7; Daryll Currier Custody Agreement (docket no. 456-12) at 9, 10, 11-12, 13, 15; Roy Currier Custody Agreement (docket no. 456-12) at 17, 18, 19-20, 21, 23; Phillip L. Rosemann Custody Agreement (docket no. 616-1) at 5, 6, 7-8, 9, 11; Leonard Roman Custody Agreement (docket no. 651-11) at 1, 2, 3-4, 5, 7.[8] Each Customer paid Enterprise an annual fee of

---

[8] The parties agree that the language in Sections 1, 4, 5, 9, 12 and 26 is identical for each Custody Agreement. *See* Response to Plaintiffs' Statement of Material Facts in Support of Plaintiffs' Motion at 22-24. Therefore, the parties appear to agree that the language in each Custody Agreement is identical. For ease of reading, the court will cite
(continued...)

$1,250 for its services. Complaint ¶ 119; Enterprise Fee Invoice (docket no. 456-13). Sixteen Plaintiffs[9] designated Sigillito or Martin Sigillito & Associates as their investment advisor, while four or five designated Gerald Messenger[10] and twenty or twenty-one left Section 26 blank. Despite the fact that twenty-two or twenty-three Plaintiffs did not designate Sigillito as their investment advisor, "Enterprise operated as if Martin Sigillito & Associates was the investment advisor for every British Lending Program IRA." Complaint ¶ 161.

Each Customer listed Enterprise as the account custodian and identified an attorney as "the Lender's Solicitors" in the loan agreement. *See, e.g.*, David Caldwell Loan Agreement (docket no. 456-6) at 2. Pursuant to the Custody Agreements, the Customers made payments into their IRAs by sending money to Enterprise. Although the loan agreements listed Distinctive Properties as the borrower, after Customers executed their loan agreements and sent their IRA loan funds to Enterprise, Enterprise mailed the Customers' money to Sigillito's IOLTA account at a St. Louis Bank without written documentation or confirmation that Smith or Distinctive Properties ultimately received the loan funds. Complaint ¶¶ 133-135. Customers generally did not give Enterprise any instructions to send the loan funds to Sigillito. Rather, Enterprise took instruction from Sigillito.

---

[8](…continued)
to the Thomas Currier Custody Agreement when referencing the Custody Agreements.

[9] Plaintiffs state that eighteen Plaintiffs designated Sigillito or Martin Sigillito & Associates as the investment advisor. As Enterprise points out, Plaintiffs' figure is incorrect. *See* Resistance to Plaintiffs' Motion at 7 n.9; Statement of Material Facts in Support of Enterprise's Motion ¶ 16.

[10] Plaintiffs assert that five Plaintiffs designated Messenger as their investment advisor, while Enterprise asserts that four did so. *See* Response to Plaintiffs' Statement of Material Facts in Support of Plaintiffs' Motion at 42. This discrepancy is immaterial for the purposes of this Order.

As custodian, Enterprise mailed Customers periodic account statements that purported to show the assets in their IRAs, periodic interest payments and other information. These statements "reinforced the belief that the loans were secure" because the statements "falsely showed that the money was sent to England and that the value of the accounts increased with yearly interest payments from England. Without the fraudulent account statements, the [Customers] would not have made, or rolled over (re-invested), their loans." *Id.* ¶ 26. However, Enterprise sent the money to Sigillito, rather than to Smith or Distinctive Properties, and never confirmed whether Sigillito ultimately sent the money to Smith or Distinctive Properties. Additionally, Enterprise misrepresented "that the repayment of principle [sic] and interest [to the Customers] was made directly from Distinctive Properties." *Id.* ¶ 144. "However, Enterprise never received any repayment directly from Distinctive Properties." *Id.* ¶ 146. Enterprise also increased the value in Plaintiffs' accounts with roll-over principal and interest, even when Enterprise never received such income. *Id.* ¶ 147.

In 2009, Enterprise sent an Acknowledgment and Indemnification Agreement to Customers, which provided: "I hereby release, indemnify, hold harmless and discharge Enterprise . . . , as Custodian, from any and all claims, demands, damages, liabilities or other expenses in connection with the investments held in my IRA account." Acknowledgment and Indemnification Agreement (docket no. 456-19) at 2.[11]

### D. Collapse of the BLP

On April 28, 2011, the government filed a twenty-two count Indictment against Sigillito, Brown and Smith, charging wire fraud, mail fraud, conspiracy to commit mail and wire fraud and engaging in and attempting to engage in money laundering transactions. *See* Indictment (docket no. 2), *United States v. Martin T. Sigillito et al.*, 11-CR-168-LRR

---

[11] The Acknowledgment and Indemnification Agreement provided to the court relates to Plaintiff Leonard Roman's IRA and is not signed.

(E.D. Mo. filed Apr. 28, 2011). On June 1, 2011, Enterprise notified the Customers that it was assigning a value of $0 for the loans that were part of the BLP. Complaint ¶ 174. Brown and Smith plead guilty to the charges against them in the Indictment. Sigillito proceeded to trial and, on March 19, 2012, a jury trial on Counts 1 through 22 of the Indictment commenced. On April 13, 2012, the jury returned guilty verdicts on Counts 1 through 13 and 16 through 22 of the Indictment.

## VI. ANALYSIS

The court will consider each of Plaintiffs' claims in the Complaint against Enterprise and determine whether summary judgment is appropriate. First, the court will consider whether summary judgment in favor of Enterprise is appropriate with respect to Counts I and II. Next, because Enterprise and Plaintiffs both moved for summary judgment on Counts III and IV, the court will consider whether summary judgment in favor of Plaintiffs or Enterprise is appropriate with respect to Counts III and IV.[12]

The court will apply Missouri law to Plaintiffs' state-law claims in Counts III and IV. The parties agree that Missouri law applies. In addition, the Custody Agreements provide that they "shall be governed by the laws of the State of Missouri." Thomas Currier Custody Agreement at 5.

### A. Count I

In Count I of the Complaint, Plaintiffs allege that Enterprise violated RICO, 18 U.S.C. § 1962(c). In Enterprise's Motion, Enterprise argues that the court should grant summary judgment in its favor with respect to Count I because the alleged association-in-fact enterprise between Martin Sigillito & Associates and the British American Group is

---

[12] When considering Counts III and IV, the court shall consider Enterprise's Motion and supporting documents in conjunction with Plaintiffs' Motion and supporting documents. That is, the court shall consider the record as a whole. As noted above, Counts III and IV only pertain to forty-one Plaintiffs. However, for ease of reading, the court will refer to the forty-one Plaintiffs asserting Counts III and IV as Plaintiffs, generally.

not a proper RICO enterprise because it is indistinguishable from the alleged pattern of racketeering. With respect to this argument, Enterprise further claims that, "[a]side from the operation of the Ponzi scheme, the association of [Martin Sigillito &] Associates and [the] British American Group does not exist as a stand-alone entity." Brief in Support of Enterprise's Motion at 6. Additionally, Enterprise argues that summary judgment in its favor is appropriate with respect to Count I because Enterprise did not participate in the operation or management of an identifiable enterprise.

In the Resistance to Enterprise's Motion, Plaintiffs contend that summary judgment in Enterprise's favor is not appropriate because the RICO association has an ascertainable structure because "[t]he Metis loan [that Sigillito negotiated] is outside the BLP and shows that the two corporations have a structure distinct from the predicate acts at issue in this case." Resistance to Enterprise's Motion at 18. Additionally, Plaintiffs contend that Enterprise "participated in the core money laundering activities" of the RICO enterprise and, therefore, in the operation and management of the enterprise. *Id.* at 22.

### 1.    *Violation of RICO, 18 U.S.C. § 1962(c)*

Congress enacted RICO "to curb the infiltration of legitimate business organizations by racketeers." *Sinclair v. Hawke*, 314 F.3d 934, 943 (8th Cir. 2003) (quoting *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 990 (8th Cir. 1989)) (internal quotation mark omitted). To this end, Congress created a private cause of action for those injured by racketeering activity. Pursuant to 18 U.S.C. § 1964(c):

> Any person injured in his business or property by reason of a violation of [18 U.S.C. §] 1962 may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [§] 1962.

18 U.S.C. § 1964(c). Under 18 U.S.C. § 1962(c), it is "unlawful for any person

employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "Racketeering activity" includes the offenses of mail fraud, wire fraud and money laundering. 18 U.S.C. § 1961(1)(B).

To prove a violation of § 1962(c), a plaintiff must show: "(1) the existence of an enterprise; (2) conduct by the defendants in association with the enterprise; (3) the defendants' participation in at least two predicate acts of racketeering; and (4) conduct that constitutes a pattern of racketeering activity." *In re Sac & Fox Tribe of the Miss. in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 767 (8th Cir. 2003); *see also Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009) (stating that a plaintiff must show "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity'" (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985))).

### 2.    Existence of an enterprise

#### a.    Applicable law

In order to satisfy the first element of a claim under RICO, 18 U.S.C. § 1962(c), a plaintiff must establish "the existence of an enterprise." *In re Sac & Fox Tribe of the Miss. in Iowa/Meskwaki Casino Litig.*, 340 F.3d at 767. "An 'enterprise' is defined to include 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1026 (8th Cir. 2008) (quoting 18 U.S.C. § 1961(4)). An enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

"Three elements must be proven to show that a RICO enterprise existed: (1) a common purpose that animates the individuals associated with it; (2) an ongoing organization with members who function as a continuing unit; and (3) an ascertainable

structure distinct from the conduct of a pattern of racketeering." *United States v. Lee*, 374 F.3d 637, 647 (8th Cir. 2004). In light of the United States Supreme Court's holding in *Boyle v. United States*, 556 U.S. 938 (2009), it is not necessary to show any structural elements of the enterprise beyond those that may be reasonably interpreted from the statute. *See id.* at 945-48 (explaining that, although the existence of an enterprise is a separate element that must be proved and requires three structural features—"a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose"—a RICO enterprise is not limited to "business-like entities" and does not require a "hierarchal structure" or a "chain of command").

"In deciding whether an alleged RICO enterprise has an ascertainable structure distinct from the pattern of racketeering activity, [the court] must 'determine if the enterprise would still exist were the predicate acts removed from the equation.'" *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 354-55 (8th Cir. 2011) (quoting *Handeen v. Lemaire*, 112 F.3d 1339, 1352 (8th Cir. 1997)); *see also United States v. Bledsoe*, 674 F.2d 647, 664 (8th Cir. 1982) ("[A]n enterprise cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts."). Whether the enterprise has a structure that is distinct from the pattern of racketeering activity turns on whether the enterprise would still exist if the conduct that constitutes the racketeering activity were absent. *See Crest Constr. II, Inc.*, 660 F.3d at 354-55. "The focus of the inquiry is whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense." *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 770 (8th Cir. 1992).

In *Stephens, Inc. v. Geldermann, Inc.*, 962 F.2d 808 (8th Cir. 1992), the Eighth Circuit Court of Appeals considered whether an alleged association-in-fact enterprise had a structure distinct from the pattern of racketeering activity. *Id.* at 815. There, the plaintiff brought a RICO claim against a commodities-futures merchant, seeking to recover

trading losses. *Id.* at 810-11. The plaintiff alleged the existence of an association-in-fact enterprise. *Id.* at 815. The Eighth Circuit held that the plaintiff failed to allege a proper RICO enterprise distinct from the alleged pattern of racketeering activity because "[t]his *group* . . . had no structure independent of the alleged racketeering activity" and "[t]he only common factor that linked . . . the parties together and defined them as a distinct *group* was their direct or indirect participation in [the] scheme to defraud [the plaintiff]." *Id.* at 815-16 (emphasis added). The Eighth Circuit further stated that, although each member of the enterprise "carried on other legitimate activities, these activities were not in furtherance of the common or shared purpose of the enterprise and, thus, were not acts of the enterprise." *Id.* at 816. Thus, in *Stephens*, the Eighth Circuit found that the plaintiff's RICO claim could not stand because, "[a]bsent the predicate acts of wire and mail fraud, the association-in-fact enterprise which [the plaintiff] alleged had no form or structure." *Id.*

### b. *Application*

In the Complaint, Plaintiffs allege the existence of an association-in-fact enterprise between Martin Sigillito & Associates and the British American Group, which "functioned as an informal association" and engaged in activities which affected "both interstate and foreign commerce." Complaint ¶ 206. Enterprise contends that such enterprise is "indistinguishable from the alleged pattern of racketeering activity" and, thus, is "not a proper RICO enterprise." Brief in Support of Enterprise's Motion at 5. In the Resistance to Enterprise's Motion, Plaintiffs contend that the association-in-fact between Martin Sigillito & Associates and the British American Group qualifies as a RICO enterprise because the association "provide[s] international business consulting services, like the $5 million Turkish loan to Metis for Phil[lip] Rosemann." Resistance to Enterprise's Motion at 18. "The Metis loan is outside the BLP and shows that the two corporations have a

structure distinct from the predicate acts at issue in this case." *Id.*[13]

The court finds that Plaintiffs' argument is without merit. The Complaint fails to point to any activity of the alleged enterprise that is distinct from the racketeering activity at issue. In the Resistance to Enterprise's Motion, the only non-racketeering activity that Plaintiffs point to is the loan between Metis, a Turkish company, and Braithwaite, a Belize corporation incorporated by Sigillito for Phillip L. Rosemann, a Plaintiff in the instant case, as a vehicle to reduce Rosemann's taxes and limit his liability. Sigillito drafted, negotiated, reviewed and approved the note between Braithwaite and Metis. On October 22, 2012, the court granted Metis's motion to dismiss for lack of subject matter jurisdiction. October 22, 2012 Order at 25. In the October 22, 2012 Order, the court noted that "[t]here is no allegation that Metis was in any way involved with . . . the BLP, and there is no evidence that the money involved in the dispute between Metis and Braithwaite was involved in the Ponzi scheme." *Id.* at 11. In addition, the court held that "[t]he fact that Sigillito was associated with the agreement between Metis and Braithwaite and also played a role in the alleged RICO violations" was not a sufficient connection to allow the court to exercise supplemental subject matter jurisdiction over Plaintiffs' claims against Metis. Plaintiffs have alleged no additional facts to show how the alleged enterprise, rather than Sigillito, was involved with the Metis loan. There is nothing in the record to suggest that the British American Group was involved with the Metis loan. Thus, the Metis loan does not qualify as a non-racketeering activity of the alleged enterprise.

Furthermore, even if Sigillito "carried on other legitimate activities, these acts were not in furtherance of the common or shared purpose of the enterprise and, thus, were not acts of the enterprise." *Stephens*, 962 F.2d at 816. Thus, any legitimate activities carried

---

[13] As noted above, Metis and Metis Holding A.S. are former Defendants in this action. The court dismissed Plaintiffs' claims against Metis and Metis Holding A.S. for lack of jurisdiction. *See* October 22, 2012 Order (docket no. 476).

on by Martin Sigillito & Associates or the British American Group *individually* are not sufficient to show a structure beyond that inherent in the pattern of racketeering activity because "[t]he only common factor that linked" Martin Sigillito & Associates with the British American Group "and defined them as a distinct *group* was their direct or indirect participation in [the] scheme to defraud [Plaintiffs]." *Id.* at 815-16 (emphasis added). Therefore, the court finds that Plaintiffs have not shown that the alleged association-in-fact of Martin Sigillito & Associates and the British American Group has any structure distinct from the alleged racketeering activities and, accordingly, have failed to show the existence of a RICO enterprise.

### 3. Conduct in association with the enterprise

#### a. Applicable law

In order to satisfy the second element of a claim under RICO, 18 U.S.C. § 1962(c), a plaintiff must show "conduct by the defendants in association with the enterprise." *In re Sac & Fox Tribe of the Miss. in Iowa/Meskwaki Casino Litig.*, 340 F.3d at 767. The Supreme Court has held that a plaintiff must show that the defendant "has participated in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). "In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Id.* at 179 (quoting 18 U.S.C. § 1962(c)). "[I]t is not necessary that a RICO defendant have wielded control over the enterprise, but the plaintiff 'must prove some part in the *direction* . . . of the enterprise's affairs.'" *Handeen*, 112 F.3d at 1348 (quoting *United States v. Darden*, 70 F.3d 1507, 1543 (8th Cir. 1995)).

"An enterprise is 'operated' not just by upper management but also by lower rung participants who . . . are under the direction of upper management." *Reves*, 507 U.S. at 184; *see also id.* at 184 n.9 (declining to decide how far RICO liability may extend down the ladder of an enterprise's operation because the defendant was not liable because he was not acting under the direction of the enterprise). Additionally, an enterprise may be

operated or managed by "outsiders" who are associated with the enterprise "who exert control over it as, for example, by bribery." *Id.* at 184-85. "'[O]utsiders' may be liable under § 1962(c) if they are 'associated with' an enterprise and participate in the conduct of *its* affairs—that is, participate in the operation or management of the enterprise itself." *Id.* at 185.

The Supreme Court's use of bribery as an example of an outsider's act that may qualify as "operation or management" of the enterprise suggests that it is difficult to find an outsider liable under § 1962(c). *See, e.g.*, *Abbott v. Chem. Trust*, No. 01-2049-JWL, 2001 WL 492388, at *15 (D. Kan. Apr. 26, 2001) (dismissing the plaintiffs' RICO claim against a bank that was an outsider to the enterprise operating a Ponzi scheme, stating that "simply provid[ing] goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result" (alteration in original) (quoting *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1102 (10th Cir. 1999)) (internal quotation marks omitted)); *Dep't of Econ. Dev. v. Arthur Anderson & Co. (U.S.A.)*, 924 F. Supp. 449, 467 (S.D.N.Y. 1996) (stating that the Supreme Court's bribery example "emphasizes how difficult it is to hold an outsider liable under § 1962(c) after *Reves*"); *De Wit v. Firstar Corp.*, 879 F. Supp. 947, 965-66 (N.D. Iowa 1995) (dismissing a § 1962(c) claim where the "defendants' conduct was one step removed from management of the RICO enterprise itself," after reasoning that "even provision of services essential to the operation of the RICO enterprise itself is not the same as participating in the conduct of the affairs of the enterprise").

"Furnishing a client with ordinary professional assistance, even when the client happens to be a RICO enterprise, will not normally rise to the level of participation sufficient to satisfy the Supreme Court's pronouncements in *Reves*." *Handeen*, 112 F.3d at 1348. Thus, "an attorney or other professional does not conduct an enterprise's affairs through run-of-the mill provision of professional services." *Id.*

Appreciation for the unremarkable notion that the operation or

> management test does not reach persons who perform routine
> services for an enterprise should not, however, be mistaken for
> an absolute edict that an attorney who associates with an
> enterprise can never be liable under RICO. An attorney's
> license is not an invitation to engage in racketeering, and a
> lawyer no less than anyone else is bound by generally
> applicable legislative enactments. Neither *Reves* nor RICO
> itself exempts professionals, as a class, from the law's
> proscriptions, and the fact that a defendant has the good
> fortune to possess the title "attorney at law" is, standing alone,
> completely irrelevant to the analysis dictated by the Supreme
> Court.

*Id.* at 1349. Many other courts have also acknowledged the principle that merely furnishing a client with ordinary professional assistance will not generally rise to the level of participation in an enterprise that is sufficient to satisfy the operation or management test. *See Reves*, 507 U.S. at 185 (applying the operation or management test and holding that the defendant-accounting firm's conduct was insufficient to impose RICO liability when the accounting firm prepared audits, reviewed transactions, certified records as fair representations of the enterprise's financial status and presented reports to the enterprise's directors and shareholders); *Walter v. Drayson*, 538 F.3d 1244, 1248-49 (9th Cir. 2008) (holding that an attorney's provision of services did not satisfy the operation or management test); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727-28 (7th Cir. 1998) (finding a doctor and two other defendants not liable because "simply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability under § 1962(c)"); *Nolte v. Pearson*, 994 F.2d 1311, 1317 (8th Cir. 1993) (holding that the defendant-attorneys' conduct was insufficient to impose RICO liability when the attorneys prepared an opinion letter and accompanying memorandum advising investors of federal income tax consequences, a defense letter agreeing to render legal assistance to investors and two documents explaining whether changes in federal tax laws would have a material effect on an investor's income taxes).

However, attorneys and other professionals may be liable under § 1962(c) "when [they] cross[] the line between traditional rendition of [professional] services and active participation in directing the enterprise." *Handeen*, 112 F.3d at 1349, 1350 (reversing the district court's dismissal of the plaintiff's claim under 18 U.S.C. § 1962(c) against a law firm because the allegations that the firm assisted in the manipulation of the bankruptcy process to obtain a discharge for the plaintiff, if true, would justify a finding that the attorneys "'participated in the core activities that constituted the affairs of the [estate]'" and, thus, that the attorneys "participated in the conduct of the alleged RICO enterprise" (alteration in original) (quoting *Napoli v. United States*, 32 F.3d 31, 36 (2d Cir. 1994), *aff'd on reh'g*, 45 F.3d 680 (2d Cir. 1995)); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 978-79 (7th Cir. 1995) (reversing the district court's dismissal of a RICO claim because the exhibition contractors were not "outsiders" when they acted at the direction of upper management and "were vital to the achievement of the enterprise's primary goal" and, thus, the plaintiff's allegations were sufficient to establish the defendants' participation in the operation or management of a RICO enterprise); *Napoli*, 32 F.3d at 35-36 (affirming attorneys' convictions for RICO violations where they "played some part in directing the affairs of the charged enterprise," "participated in the [enterprise's] core activities" and "discharged their responsibility through a pattern of illegal acts"); *In re Am. Honda Motor Co., Dealerships Relations Litig.*, 941 F. Supp. 528, 559-60 (D. Md. 1996) (finding allegations that attorneys "were paid directors with a full voice on American Honda" and "handled Honda's internal investigations and assisted in covering up the scheme" sufficiently alleged the attorneys participated in a RICO enterprise); *Tribune Co. v. Purcigliotti*, 869 F. Supp. 1076, 1097 (S.D.N.Y. 1994) (finding that a complaint sufficiently alleged that a doctor participated in the operation or management of the enterprises where he "'participated in the core activities that constituted the affairs' of the enterprises by performing inaccurate audiograms and falsely certifying these audiograms" (quoting *Napoli*, 32 F.3d at 36)), *aff'd on other grounds sub nom.*

*Tribune Co. v. Abiola*, 66 F.3d 12 (2d Cir. 1995); *Clark v. Milam*, 847 F. Supp. 409, 417 (S.D. W. Va. 1994) (declining to dismiss allegation that accountants "knowingly concealed the activity of other defendants who exercised day-to-day control over the enterprise" because the concealment was "integral to the continuing operation of the RICO enterprise"), *aff'd on other grounds sub nom. Clark v. Allen*, 139 F.3d 888 (unpublished table decision), Nos. 95-2487, 96-1116, 96-1276, 1998 WL 110160 (4th Cir. 1998) (per curium).

### b.    *Application*

In the Complaint, Plaintiffs claim that Enterprise "exercised a significant degree of direction over the affairs of the [a]ssociation of [Martin] Sigillito [& Associates] [and] [the] British American [Group]." Complaint ¶ 211. Plaintiffs' allegations in Count I suggest that Enterprise may have assisted the alleged RICO enterprise; however, there is no evidence suggesting that Enterprise directed the enterprise, exerted substantial control over its affairs or managed its basic structure. Rather, Plaintiffs' allegations suggest that Enterprise provided its regular, custodial services to Plaintiffs and did nothing beyond engaging in the operation or management of its own affairs.

The Eighth Circuit addressed the distinction between a defendant managing an enterprise's affairs and a defendant merely managing its own affairs in *Dahlgren v. First National Bank of Holdrege*, 533 F.3d 681, 688 (8th Cir. 2008). In *Dahlgren*, cattle investors and corn producers sued a bank for, among other things, damages under § 1962(c). *Id.* at 686. The plaintiffs alleged that the bank "misled them into continuing to do business with [a cattle company and RICO enterprise] by concealing [the cattle company's] increasing financial weakness to protect the [b]ank's substantial interest as [the cattle company's] creditor." *Id.* A jury found the bank liable and the district court denied the bank's post-trial motion for judgment as a matter of law. *Id.* The Eighth Circuit reversed. *Id.*

The Eighth Circuit concluded that, "[w]ith one possible exception, all of the

[b]ank's actions that [the] plaintiffs cite[d] as evidence of the [b]ank's control of [the cattle company] [fell] into the category of a creditor conducting its own affairs." *Id.* at 690. The Eighth Circuit summarized the bank's conduct by noting that the bank allowed the commingling of funds from different entities, honored substantial overdrafts that effectively increased the cattle company's line of credit, allowed notes due to the bank to remain past due, honored insufficient checks to investors, encouraged another bank to participate in the lines of credit, recommended the cattle company to other bank customers and required the cattle company owner to take particular actions to get a loan approved. *See id.* The Eighth Circuit noted that "simply because a bank allows a heavily indebted customer to take actions such as overdrafts and late note payments that the bank might prevent by exercising its formidable rights as creditor is not evidence that the bank controlled the customer's operations and management." *Id.* (emphasis omitted). The Eighth Circuit then discussed the one transaction that may have crossed the line into control and held that this one "isolated incident" was insufficient to demonstrate a pattern of racketeering activity. *Id.* at 690-92. Thus, the Eighth Circuit concluded that the plaintiffs failed to establish that the bank directed the operation or management of the cattle company. *Id.* at 692.

The court finds that Plaintiffs have failed to make the requisite showing that Enterprise directed the operation or management of the association-in-fact enterprise. The court notes that on October 31, 2011, it dismissed Count I of the Amended Complaint (docket no. 40) against Enterprise, finding that Plaintiffs failed to allege "that Enterprise participated in the operation or management" of the RICO enterprise. October 31, 2011 Order (docket no. 220) at 31. In the October 31, 2011 Order, the court noted that the Amended Complaint alleged, with respect to Enterprise's participation in the RICO enterprise, that:

> Enterprise had a continuing relationship with Paul Vogel;
> Defendants transferred all of the IRA loans to Enterprise for

custody and supervision; the individual IRA lenders entered into custody agreements with Enterprise; each IRA lender paid at least $1,250 per year for Enterprise's "safekeeping" of the IRA loans; the custody agreements indicated that the loans were securities; Enterprise sent Plaintiffs periodic account statements that falsely represented the amount of [principal] and interest of each loan; Enterprise sent the IRA loan funds directly to Sigillito in the form of checks made payable to Martin Sigillito & Associates; and Enterprise did not receive any written documentation or confirmation that Smith or Distinctive Properties ultimately received the loan funds.

*Id.* at 30. The court went on to find that, "[a]lthough these allegations are troublesome, they do not suggest that Enterprise directed the operation or management of [the alleged RICO enterprise]." *Id.* The court granted Plaintiffs leave to amend the Amended Complaint and, on January 1, 2012, Plaintiffs filed a Second Amended Complaint (docket no. 252). On September 12, 2012, Plaintiffs filed a Third Amended Complaint (docket no. 420) and, on October 11, 2012, Plaintiffs filed the instant Complaint. In each of these amended complaints, Plaintiffs realleged Count I against Enterprise. However, the court finds that Plaintiffs have still failed to show that Enterprise participated in the operation or management of the enterprise. Plaintiffs have not alleged any additional facts supporting their assertion that Enterprise was sufficiently involved with the enterprise's affairs to impose liability under § 1962(c), beyond those alleged in the Amended Complaint. Plaintiffs claim that Enterprise was willfully ignorant of the criminal nature of the BLP and that Enterprise actively worked to conceal the true state of the BLP from Plaintiffs. These allegations, if true, suggest that Enterprise may have assisted with the enterprise; however, such allegations do not show that Enterprise was involved in the operation or management of the enterprise. *See Dahlgren*, 533 F.3d at 689-90 (finding that, even in light of the plaintiffs' allegations that the defendant-bank induced the plaintiffs to invest with the alleged RICO enterprise by concealing the enterprise's financial weakness, the bank acted as "a creditor conducting its own affairs," with one exception,

and, thus, the allegations were not sufficient to conclude that the bank was engaged in the operation or management of the enterprise).

In addition, the Statement of Material Facts in Support of Enterprise's Motion supports the court's finding that Enterprise did not participate in the operation or management of the enterprise. In the Statement of Material Facts in Support of Enterprise's Motion, Enterprise asserts that it "did not direct, operate, or manage the British Lending Program, Martin Sigillito [&] Associates, [the] British American Group, or any association of those entities." Statement of Material Facts in Support of Enterprise's Motion ¶ 6. As discussed above, Plaintiffs did not properly respond to the Statement of Material Facts in Support of Enterprise's Motion and, thus, such facts are considered undisputed. *See* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . ."); E.D. Mo. L.R. 4.01(E) ("All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party."). Therefore, the court finds that Plaintiffs have failed to show that Enterprise participated in the operation or management of the alleged RICO enterprise.

### 4. *Summary*

In light of the foregoing, the court finds that there is no genuine issue of material fact as to whether Enterprise is liable under 18 U.S.C. § 1962(c). The court finds that Plaintiffs' claim against Enterprise in Count I fails because: (1) Plaintiffs have not shown the existence of a RICO enterprise because the alleged association-in-fact enterprise has no ascertainable structure distinct from the alleged racketeering activities; and (2) Plaintiffs have not shown that Enterprise participated in the operation or management of the alleged

RICO enterprise.[14]  Accordingly, the court shall grant Enterprise's Motion to the extent that it requests that the court grant summary judgment in Enterprise's favor on Count I.

## B.  Count II

In Count II of the Complaint, Plaintiffs allege that Enterprise conspired to violate RICO, 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).  In Enterprise's Motion, Enterprise argues that the court should grant summary judgment in its favor on Count II because "there is no evidence that [Enterprise] knew of the alleged conspiracy to operate a Ponzi scheme, nonetheless any evidence that [Enterprise] agreed to join the conspiracy." Brief in Support of Enterprise's Motion at 9.  Enterprise further contends that "[o]ne cannot negligently or unknowingly join a RICO conspiracy" and, therefore, a showing of willful blindness is not sufficient to satisfy Plaintiffs' burden.  *Id.* at 10.  Additionally, Enterprise's argument with respect to Count I, that a proper RICO enterprise did not exist, is also relevant to Count II.

In the Resistance to Enterprise's Motion, Plaintiffs argue that Enterprise was willfully blind to the affairs of the enterprise and, thus, Enterprise had the requisite knowledge to establish a conspiracy.  Further, Plaintiffs contend that they have alleged a proper RICO enterprise.

### 1.  Conspiracy to violate RICO, 18 U.S.C. § 1962(d)

Pursuant to 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).  The prevailing law in the Eighth Circuit is that, in order "[t]o establish the charge of conspiracy to violate the RICO statute," a party must prove: (1) that an

---

[14] Because the court finds that Plaintiffs have not satisfied the first or second elements of a claim under § 1962(c), the court finds it unnecessary to address the additional elements. *See Nolte*, 994 F.2d at 1317 (finding it unnecessary to address any other elements of the plaintiff's § 1962 claim when there was no evidence that the defendants participated in the operation or management of the enterprise).

enterprise existed; (2) that the enterprise affected interstate or foreign commerce; (3) that the defendant associated with the enterprise; and (4) "that the defendant 'objectively manifested an agreement to participate . . . in the affairs of [the] enterprise.'" *Darden*, 70 F.3d at 1518 (alterations in original) (quoting *United States v. Bennett*, 44 F.3d 1364, 1374 (8th Cir. 1995)) (internal marks omitted).

## 2. Application

As discussed above, the court finds that Plaintiffs have failed to show the existence of a RICO enterprise with a "structure distinct from that inherent in a pattern of racketeering." *Atlas Pile Driving Co.*, 866 F.2d at 995. Because a showing of the existence of a RICO enterprise is a necessary element of a claim under 18 U.S.C. § 1962(d) as well as 18 U.S.C. § 1962(c), the court finds that Plaintiffs cannot prove that Enterprise conspired to violate 18 U.S.C. § 1962(c). In light of this finding, the court finds it unnecessary to address the parties' additional arguments with respect to Count II. *See Nolte*, 994 F.2d at 1317. Accordingly, the court shall grant Enterprise's Motion to the extent that it requests that the court grant summary judgment in Enterprise's favor on Count II.[15]

## C. Count III

In Count III of the Complaint, Plaintiffs allege that Enterprise breached Sections 1,

---

[15] The court notes that, although it shall summary judgment in Enterprise's favor on Counts I and II, the claims over which the court has original jurisdiction, the court may and will continue to exercise supplemental jurisdiction over the claims in Counts III and IV. *See* 28 U.S.C. § 1367. The court finds the exercise of such supplemental jurisdiction is appropriate given the stage of the litigation. *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) ("[W]hen deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988))); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary.").

4, 5 and 26 of the Custody Agreements "by not providing safekeeping of IRA assets," Complaint ¶ 251; distributing Plaintiffs' IRA funds without receiving instruction from Plaintiffs to do so; taking instruction from Sigillito regarding the distribution of Plaintiffs' IRA funds; paying for the Distinctive Properties notes prior to receipt of any loan agreement; and failing to buy and sell assets through a "brokerage firm," Thomas Currier Custody Agreement at 7, for accounts with a designated investment advisor.

Section 1 of the Custody Agreements provides that Enterprise "agrees to hold and keep safely all securities and other property . . . which Customer shall elect to deposit in the Account." *Id.* at 1. "[T]hereafter[,] [Enterprise] shall be responsible for such Assets only until such time as they have been transmitted to and received by another person or entity . . . ." *Id.*

Section 4 of the Custody Agreements provides, in relevant part, that "Enterprise . . . shall make distributions from the Account as directed, in writing, by customers." *Id.* at 2. Plaintiffs contend that, pursuant to Section 4, "Enterprise could only purchase a loan (pay cash), or accept a rollover for payment of the loan (remove an asset), by written and not oral approval of the customer, and only the customer." Brief in Support of Plaintiffs' Motion at 4.

Section 5 of the Custody Agreements provides:

> On receipt of Instructions, Enterprise . . . shall purchase additional securities in the Account, and shall charge the Account an amount that will cover the cost of the securities purchased plus all related charges . . . . Such payment shall be made only upon receipt by Enterprise . . . of the securities so purchased in such form as is satisfactory to Enterprise . . . .

Thomas Currier Custody Agreement at 2.

Section 26 of the Custody Agreements provides an optional space for the Customer to designate a broker or investment advisor, upon whose instruction Enterprise "is directed to accept and to fully rely upon . . . with respect to the purchase and sale of, and other

transactions in securities, . . . with the brokerage firm of Investment Advisor's choosing, and no further authorization by Customer shall be required." Thomas Currier Custody Agreement at 7.

### 1. Applicable law

Under Missouri law, in order to allege breach of contract, a plaintiff must show: "(1) the making and existence of a valid and enforceable contract between [the plaintiff] and [the defendant]; (2) the right of [the plaintiff] and the obligation of [the defendant] thereunder; (3) a violation thereof by [the defendant]; and (4) damages resulting to [the plaintiff] from the breach." *Trotter's Corp. v. Ringleader Rests., Inc.*, 929 S.W.2d 935, 941 (Mo. Ct. App. 1996); *see also Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010) (en banc) (listing the essential elements of a breach of contract claim).

### a. Causation requirement

"General principles of contract law impose a causation requirement on the recovery of damages." *Monarch Fire Prot. Dist. of St. Louis Cnty., Mo. v. Freedom Consulting & Auditing Servs., Inc.*, 678 F. Supp. 2d 927, 941-42 (E.D. Mo. 2009) (applying Missouri law to a breach of contract claim); *see also Abbott v. Haga*, 77 S.W.3d 728, 733 (Mo. Ct. App. 2002) (holding that a breach of contract claim failed when the respondent could not prove that his damages resulted from the appellant's breach). Under a breach of contract, the breaching party is liable for "damages naturally and proximately caused by the breach." *Guidry v. Charter Commc'ns, Inc.*, 269 S.W.3d 520, 533 (Mo. Ct. App. 2008); *see also Gateway W. Ry. Co. v. Morrison Metalweld Process Corp.*, 46 F.3d 860, 862 (8th Cir. 1995) (noting that under Missouri contract law, the doctrine of proximate cause limits the breaching party's liability). "Proximate cause is a question of fact for the jury" and a "plaintiff must be able to show by clear, admissible evidence the connection between the alleged breach and identifiable, provable damages." Howard O. Hunter, *Modern Law of Contracts* § 14:7 (2013); *see also In re Genetically Modified Rice Litig.*, Nos. 4:06MD1811 CDP, 4:07CV1211 CDP, 2010 WL 1186567, at *2 (E.D. Mo. Mar. 29,

2010) ("Proximate cause is typically a question of fact for the jury.").

The Missouri Court of Appeals addressed the causation element of a breach of contract claim in *Equity Mutual Insurance Co. v. Affiliated Parking, Inc.*, 448 S.W.2d 909 (Mo. Ct. App. 1969). In that case, an insurance company asserted a breach of contract claim against the defendant, a parking lot operator. *Id.* at 910. The defendant leased the property that the parking lot sat on from the City of St. Louis. *Id.* The defendant and the City entered into a contract, which provided that the defendant must maintain certain types of security at the lot, including "a minimum of two station attendants and one parking lot supervisor on duty" at all times and additional "entrance and exit attendants on duty at all times as . . . necessary to provide an adequate quantity and quality of parking lot services" to the public. *Id.* The claim in *Equity Mutual Insurance* arose when a woman left her vehicle in the lot and it was stolen. There was no parking lot supervisor at the lot at the time. *Id.* at 913. The woman's insurance company sued the defendant, asserting, among other things, breach of contract for the defendant's failure to comply with its contract with the City. *Id.* at 912. The Missouri Court of Appeals assumed, arguendo, that the plaintiff could maintain an action pursuant to the contract between the defendant and the City but reversed the lower court's judgment in favor of the plaintiff, finding that the insurance company's breach of contract claim could not stand because, even if the defendant breached the contract, "there [was] no showing the damage resulted from the breach of contract." *Id.* at 913.

### b. *General contract interpretation principles*

"The cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Butler v. Mitchell-Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. 1995) (en banc). "'In determining the intent of the parties to a contract, [the court] review[s] the terms of a contract as a whole, not in isolation.'" *Lacey v. State Bd. of Registration for the Healing Arts*, 131 S.W.3d 831, 838 (Mo. Ct. App. 2004) (quoting *Tuttle v. Muenks*, 21 S.W.3d 6, 11 (Mo. Ct. App. 2000)).

"Where the contract is unambiguous, a court will ascertain the intent of the parties from the contract alone and will not resort to construction." *Monsanto Co. v. Garst Seed Co.*, 241 S.W.3d 401, 407 (Mo. Ct. App. 2007). A court will not find that a contract is ambiguous merely because the parties disagree as to the construction of the contract. *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. 2003). Rather, a court must examine whether the contract is "*reasonably* susceptible to different constructions." *Burrus v. HBE Corp.*, 211 S.W.3d 613, 617 (Mo. Ct. App. 2006) (emphasis added). A court will presume that "the intent of the parties is expressed by the natural and ordinary meaning of their language." *Id.* (quotation omitted). "The terms of a contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning." *Dunn Indus.*, 112 S.W.3d at 428 (citations omitted). "[E]ach term of a contract is construed to avoid rendering other terms meaningless." *Id.* If any uncertainty exists in a contract, the language will "be construed against the drafter." *Livers Bronze, Inc. v. Turner Constr. Co.*, 264 S.W.3d 638, 641-42 (Mo. Ct. App. 2008).

*Liberty Mut. Fire Ins. Co. v. Centimark Corp.*, No. 4:08CV230-DJS, 2009 WL 1588454, at *3 (E.D. Mo. June 5, 2009) (internal citations altered).

## 2. *Enterprise's Motion*

### a. *Parties' arguments*

In Enterprise's Motion, Enterprise argues that the court should grant summary judgment in its favor with respect to Count III for several reasons. First, Enterprise claims that it did not violate its obligation to "safekeep" in Section 1 of the Custody Agreements— a limited duty that does not require Enterprise "to advise plaintiffs [of] risks or prevent loss." Brief in Support of Enterprise's Motion at 24. Second, Enterprise argues that it complied with its duty pursuant to Section 27 of the Custody Agreements to "maintain accounting records"—a duty that did not require Enterprise to "inquire further" into the source of the interest payments. *Id.* at 25. Third, Enterprise claims that, with respect to

the sixteen Custody Agreements that list Sigillito as the investment advisor, Enterprise "can have no liability for breach of contract" for actions taken "in accordance with instructions received from [Sigillito]." *Id.* at 26.[16] Finally, Enterprise argues that Plaintiffs have not provided sufficient evidence showing that any breach of the Custody Agreements by Enterprise caused Plaintiffs' damages because Plaintiffs "chose to invest in Sigillito's investment program," which was a "worthless" Ponzi scheme. *Id.* at 27.

In the Resistance to Enterprise's Motion, Plaintiffs claim that Enterprise breached the Custody Agreements because Enterprise transferred Plaintiffs' money to Sigillito's IOLTA account without authorization from Plaintiffs and without confirmation that the money went to Distinctive Properties. In addition, Plaintiffs claim that Enterprise made distributions at the direction of Sigillito, rather than Plaintiffs, in violation of Section 4 of the Custody Agreements, regardless of whether the particular Custody Agreement listed Sigillito as the investment advisor.

### b. Application

Enterprise contends that it is entitled to summary judgment on Count III because Plaintiffs have not shown that any alleged breach by Enterprise caused Plaintiffs' damages. However, causation with respect to a breach of contract claim is generally a question of fact for the jury. *See In re Genetically Modified Rice Litig*, 2010 WL 1186567, at *2. Thus, the court finds Enterprise's causation argument is premature. In addition, Plaintiffs' allegations, if true, suggest that Enterprise played an integral role in the scheme. Without a legitimate IRA custodian, the scheme would not have operated as effectively as it did or for as long as it did. Thus, the court finds there is a genuine issue of material fact with

---

[16] Although Enterprise does not claim apparent authority as a ground for summary judgment with respect to Plaintiffs who did not designate Sigillito as the investment advisor, Enterprise contends that "many Plaintiffs conferred apparent authority upon Sigillito, such that [Enterprise] reasonably believed that Plaintiffs had authorized Sigillito to act on their behalves." Brief in Support of Enterprise's Motion at 26 n.11. Enterprise claims that it will raise this defense at trial.

respect to whether Enterprise's alleged participation in the scheme and alleged breach of the Custody Agreements caused Plaintiffs' damages.

Next, the court shall consider whether a genuine issue of material fact exists as to whether Enterprise breached any of its duties under the Custody Agreements. The parties discuss at great length whether Enterprise breached Section 4, which provides that Enterprise "shall make distributions from the Account as directed, in writing, by customers." Thomas Currier Custody Agreement at 2. As Enterprise points out, "[t]he terms of a contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning. Each term of a contract is construed to avoid rendering other terms meaningless." Brief in Support of Enterprise's Motion at 24 (quoting June 26, 2012 Order (docket no. 362) at 6) (internal quotation marks omitted). Thus, the court cannot consider Section 4 in isolation but, rather, must consider it in the context of the Custody Agreement as a whole.

Section 26 is particularly relevant to the court's analysis of whether Enterprise breached Section 4 with respect to Plaintiffs who designated Sigillito as their investment advisor. Section 26 provides that Enterprise "is directed to accept and rely fully upon all Instructions with respect to the purchase and sale of, and other transactions in securities" provided by a designated investment advisor "and no further authorization by Customer shall be required. . . . Enterprise . . . shall have no liability as a result of following such instructions." Thomas Currier Custody Agreement at 7.

Plaintiffs state that Section 26 does not alter the analysis of whether Enterprise breached Section 4 because Section 26 allows Enterprise to follow instructions from an investment advisor with respect to "what to buy" but Section 4 still directs Enterprise to follow instructions from the Customer regarding "how to buy." Resistance to Enterprise's Motion at 10. However, Section 26 requires Enterprise to rely on *all* instructions from a designated investment advisor "with respect to the purchase and sale of, and other transactions in securities." Thomas Currier Custody Agreement at 7. Section 26 does not

indicate that Enterprise can rely on such instructions only with respect to what to buy.

The Sixth Circuit Court of Appeals addressed a customer's breach of contract claim pertaining to a custody agreement that the customer entered into with the defendant-bank in *Pavlovich v. National City Bank*, 435 F.3d 560 (6th Cir. 2006). The custody agreement at issue in *Pavlovich* "required the [b]ank to 'be responsible for the safekeeping of' [the plaintiff's] investment assets entrusted to the [b]ank" and provided that "[t]he Custodian may . . . rely and act upon any written direction delivered to it . . . if purported to have been signed by [the plaintiff] or by any one or more persons specifically authorized in writing by [the plaintiff]." *Id.* at 565. The plaintiff executed a trading letter concurrently with the custody agreement, providing an investment advisor with "'sole trading authority' over her 'Fixed Income Account' and required the [b]ank 'to accept all trades from [the investment advisor] unless notified to the contrary.'" *Id.* The plaintiff argued that the bank breached the custody agreement by following the plaintiff's designated investment advisor's instructions to use the plaintiff's money to purchase the promissory notes of a company that ultimately went bankrupt in a scheme that cost the plaintiff "roughly a million-and-a-half dollars." *Id.* at 564. The Sixth Circuit affirmed the district court's grant of summary judgment in favor of the bank because it found that the bank did not breach the custody agreement when it followed the instructions of the investment advisor. *Id.* at 566

The court finds that it is unlikely that Enterprise breached Section 4 with respect to Plaintiffs who designated Sigillito as their investment advisor in Section 26. However, the court finds it unnecessary to determine which Custody Agreements, if any, Enterprise may have breached with respect to Section 4 at this point in light of the court's conclusion below that a genuine issue of material fact exists as to whether Enterprise breached Section 5 of the Custody Agreements.

Section 5 provides that, upon "receipt of Instructions, Enterprise . . . shall purchase additional securities" and shall charge the account the cost of the securities purchased plus

additional costs associated with the purchase. Thomas Currier Custody Agreement at 2. In addition, Section 5 provides that "[s]uch payment shall be made only upon receipt by Enterprise . . . of the securities so purchased." *Id.* The parties do not discuss Section 5 with respect to Enterprise's Motion. In its Resistance to Plaintiffs' Motion, however, Enterprise argues that it did not breach Section 5 because Section 5 does not apply to the purchase of Distinctive Properties notes, as the Distinctive Properties notes are "non-marketable, unique assets" and Section 5 applies only "to the purchase and sale of marketable securities." *See* Resistance to Plaintiffs' Motion at 7 (emphasis omitted).[17]

The court finds that this argument does not foreclose Plaintiffs' assertion that Enterprise breached Section 5. The definition of a security that Enterprise articulates in its Resistance to Plaintiffs' Motion is extremely narrow. However, there is nothing in the Custody Agreement indicating that the reference to "securities" therein was intended to refer only to marketable securities, "such as stocks and bonds that are publicly traded," *id.*, and not to the standard definition of a security articulated by the Securities Act of 1933, 15 U.S.C. § 77b, and the Securities Exchange Act of 1934, 15 U.S.C. § 78c, and as interpreted by federal courts. *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946) (providing that an "investment contract," included in the definition of a security under the Securities Act, "means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party"). In *W.J. Howey Co.*, the Supreme Court found an "investment contract" and, thus, a security, present where promoters sold acreages of fruit trees with "service contracts" to cultivate and market the fruit, with a portion of the net

---

[17] As noted above, the court shall consider the record as a whole when considering the parties' arguments regarding Counts III and IV. Because whether Enterprise breached Section 5 impacts the court's summary judgment analysis on Count III, it is appropriate to consider it here, even though the parties do not discuss Section 5 with regard to Enterprise's Motion.

profits going to the purchaser. *Id.* at 300. The Supreme Court stated that this definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299.

Contrary to Section 5, the evidence suggests that Enterprise received the Distinctive Properties notes a significant period of time after purchase. Statement of Material Facts in Support of Plaintiffs' Motion at 33 (providing examples of Plaintiffs whose Distinctive Properties notes were received a significant period of time after Enterprise purchased the notes). Thus, the court finds that a genuine issue of material fact exists with respect to whether Enterprise breached Section 5 of the Custody Agreements and, thus, whether Enterprise is liable under Count III of the Complaint. Accordingly, the court shall deny Enterprise's Motion to the extent that it requests that the court grant summary judgment in Enterprise's favor on Count III.

### 3.   *Plaintiffs' Motion*

#### a.   *Parties' arguments*

In Plaintiffs' Motion, Plaintiffs argue that the court should grant summary judgment in their favor with respect to Count III because Enterprise breached: (1) Section 4 of the Custody Agreements because Enterprise made distributions from Plaintiffs' accounts without instruction from Plaintiffs; (2) Section 5 of the Custody Agreements because Enterprise purchased securities without receipt of instruction from Plaintiffs and before receiving a loan agreement; and (3) Section 26 of the Custody Agreements because Enterprise failed to buy and sell assets through a "brokerage firm." Thomas Currier Custody Agreement at 7.

In the Resistance to Plaintiffs' Motion, Enterprise contends that summary judgment in Plaintiffs' favor is not appropriate because: (1) Plaintiffs have not shown that Enterprise's alleged breach of the Custody Agreements caused Plaintiffs' damages; and (2) Enterprise did not breach the Custody Agreements. Specifically, Enterprise argues that

it did not breach Section 4 of the Custody Agreements because "the Distinctive Properties notes were *investments* in an IRA account—not distributions to the customer—and, therefore, did not require written instructions from the customer" pursuant to Section 4. Resistance to Plaintiffs' Motion at 6. Additionally, Enterprise argues that any action it took based on instructions from Sigillito were justified and did not constitute a breach of the Custody Agreements.

Enterprise contends that it did not breach Section 5 of the Custody Agreements because that section applies to marketable securities, and the Distinctive Properties notes are "non-marketable, unique assets," which are governed by Section 9 of the Custody Agreement. Section 9 provides that "the term 'Instructions' shall mean written . . . or oral . . . Instructions to Enterprise . . . which Enterprise . . . reasonably believes to have been transmitted by the Customer or by any Investment Advisor." Thomas Currier Custody Agreement at 3.

Enterprise claims that it complied with Section 9 of the Custody Agreements with respect to Plaintiffs who designated Sigillito as their investment advisor because such designation justified Enterprise's reliance on Sigillito's instructions. With respect to Plaintiffs who did not designate Sigillito as their investment advisor, Enterprise argues that it was still justified in relying on Sigillito's instructions because: (1) "several . . . Plaintiffs have admitted that, even though they [did not designate Sigillito as their investment advisor], they believed that Sigillito was authorized to act as their [i]nvestment [a]dvisor," Resistance to Plaintiffs' Motion at 8; (2) Section 9 allows Enterprise to rely on instructions that it "reasonably believes to have been transmitted by the [Plaintiff] or any [designated] [i]nvestment [a]dvisor," *id.* (emphasis omitted); and (3) Plaintiffs ratified Enterprise's reliance on Sigillito's instructions.

### b.    *Application*

The court finds that summary judgment in favor of Plaintiffs on Count III is not appropriate because Plaintiffs do not establish liability or causation for each individual

Plaintiff. Rather, Plaintiffs make generalized statements with respect to Enterprise's alleged breach of the Custody Agreements. Plaintiffs claim that they "filed a motion for partial summary judgment on liability only. Plaintiffs will prove damages and causation at trial." Reply to Enterprise's Resistance to Plaintiffs' Motion at 4. However, a necessary element to show that Enterprise breached the Custody Agreements is a showing of "damages resulting to [Plaintiffs] from [Enterprise's] breach." *Trotter's Corp.*, 929 S.W.2d at 941. Thus, Plaintiffs' assertion that the court could grant summary judgment in their favor on a breach of contract claim without a showing of causation is without merit. Because Plaintiffs have failed to show each element of a breach of contract claim for each Plaintiff, the court finds that summary judgment in Plaintiffs' favor on Count III is not appropriate and shall deny Plaintiffs' Motion to the extent that it requests that the court grant summary judgment in Plaintiffs' favor on Count III. The court notes that the analysis of Count III may not be identical for each Plaintiff—particularly for those who designated Sigillito as their investment advisor. In any event, the court does not have enough evidence to support summary judgment in Plaintiffs' favor on Count III. The court finds it unnecessary to address Plaintiffs' specific arguments in light of this finding and reminds Plaintiffs that Plaintiffs are not a certified class and, thus, the instant action cannot be treated as a class action.

### D.   Count IV

In Count IV of the Complaint, Plaintiffs allege that Enterprise was negligent in providing the services it agreed to perform in the Custody Agreements. Specifically, Plaintiffs contend that, pursuant to the Custody Agreements, Enterprise owed Plaintiffs "the duty to use such skill, prudence and diligence as other IRA Custodians commonly exercise for the safekeeping of the [lenders'] IRA assets. This includes the duty to prevent prohibited transactions, conflicts of interest, and inside dealings." Complaint ¶ 256.

### 1.   Applicable law

"In Missouri, the elements that must be proven in order for a party to recover for

negligence are: (1) the existence of a legal duty owed to the plaintiff; (2) breach of that duty through a negligent act by the defendant; (3) proximate causation between the breach and the resulting injury; and (4) resulting damages." *MEMC Elec. Materials, Inc. v. Sunlight Grp., Inc.*, No. 4:08CV00535 FRB, 2008 WL 4642866, at *4 (E.D. Mo. Oct. 17, 2008) (citing *Petrol Props., Inc. v. Stewart Title Co.*, 225 S.W.3d 448, 455 (Mo. Ct. App. 2007)). "Missouri courts . . . 'do not recognize degrees of negligence and therefore do not distinguish between negligence and gross negligence.'" *Resolution Trust Corp. v. Gershman*, 829 F. Supp. 1095, 1101 (E.D. Mo. 1993) (quoting *Duncan v. Mo. Bd. for Architects, Prof'l Eng'rs & Land Surveyors*, 744 S.W.2d 524, 532 (Mo. Ct. App. 1988)).

"A legal duty owed by one to another may arise . . . because a party has assumed a duty by contract or agreement." *Hackmann v. Mo. Am. Water Co.*, 308 S.W.3d 237, 239 (Mo. Ct. App. 2009). "The law imposes upon a person who provides services the duty to render those services with 'some degree of care and skill.'" *Tom's Agspray, LLC v. Cole*, 308 S.W.3d 255, 261 (Mo. Ct. App. 2010) (quoting *Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc./Special Prods., Inc.*, 700 S.W.2d 426, 432 (Mo. 1985) (en banc)). "Whether a duty exists is a question of law, but conclusions about the facts of the case are questions for the fact-finder." *Id.* at 261-62.

When applying Missouri law to a situation involving both negligence and breach of contract, the Eighth Circuit has held that, "[u]nder Missouri law, a breach of contract alone does not give rise to a tort. The Missouri courts have recognized a distinction between negligence and nonperformance of a contract obligation." *Pippin v. Hill-Rom Co.*, 615 F.3d 886, 889 (8th Cir. 2010). "A mere failure to complete the undertaking required by contract does not give rise to a cause of action in tort; the remedy for such a failure lies in contract." *Id.* Under such a circumstance, a plaintiff must show "negligent misfeasance, such as 'the failure to exercise due care in the performance of contract undertakings, *as distinguished from mere failure to complete such undertakings*.'" *Id.* (quoting *Preferred Physicians Mut. Mgmt. Grp. v. Preferred Physicians Mut. Risk*

*Retention*, 918 S.W.2d 805, 814 (Mo. Ct. App. 1996)).

An action for professional negligence exists where, in the context of the contractual relationship, the professional negligently discharges the duties arising from that relationship. *See Lumbermens Mut. Cas. Co. v. Thornton*, 92 S.W.3d 259, 265 (Mo. Ct. App. 2005). "A professional person owes a client a duty of care commensurate with 'the degree of care, skill and proficiency commonly exercised by ordinarily skillful, careful and prudent professionals.'" *Bus. Men's Assurance Co. of Am. v. Graham*, 891 S.W.2d 438, 453 (Mo. Ct. App. 1994) (quoting *Murphy v. A.A. Mathews, a Div. of CRS Crp. Eng'rs, Inc.*, 841 S.W.2d 671, 674 (Mo. 1992) (en banc)).

"In professional negligence cases, . . . the specific duty is defined by the profession, itself." *Ostrander v. O'Banion*, 152 S.W.3d 333, 338 (Mo. Ct. App. 2004). Thus, "an expert witness is generally necessary to tell the jury what the defendant should or should not have done under the particular circumstances" and whether the defendant's actions "violated the standards of care of the profession" and, thereby, constituted negligence. *Id.*; *see also Parra v. Bldg. Erection Servs.*, 982 S.W.2d 278, 285 (Mo. Ct. App. 1998) ("In cases of alleged 'professional' negligence, with some exceptions, expert testimony is required to establish the proof element of a breach of duty."); *Brennan v. St. Louis Zoological Park*, 882 S.W.2d 271, 273 (Mo. Ct. App. 1994) ("In a professional malpractice case, the plaintiff must present the testimony of a qualified professional as to the degree of care and skill that is generally accepted by those engaged in the profession. Absent such testimony, the plaintiff cannot make a submissible case and is not entitled to recovery." (citation omitted)).

Missouri courts have found an exception to this general rule requiring expert testimony in professional negligence cases where the alleged negligence is "clear and palpable." *Roberts v. Sokol*, 330 S.W.3d 576, 581 (Mo. Ct. App. 2011) ("[I]n order to escape the requirement of expert testimony, the alleged negligence or the question of negligence, must be clear and palpable to a jury of laymen.").

43

In *Pedigo v. Roseberry*, 102 S.W.2d 600 (Mo. 1937), the Missouri Supreme Court explained why expert testimony is necessary in some negligence actions:

> If laymen are not to be guided on issues requiring peculiar and thorough special training in a science or art beyond the experience and knowledge common to mankind by witnesses possessing the necessary testimonial qualifications, juries will be cast into a river of doubt and must establish an arbitrary standard of their own founded upon conjecture and surmise in their effort to reach certain and sure ground.

*Id.* at 607; *see also Roberts*, 330 S.W.3d at 581, 581 n.4 (stating that expert testimony is not necessary in a medical or legal malpractice case where the negligence is "clear and palpable," such as "where a lawyer allows the statute of limitations to expire on a claim which had been entrusted to him for prosecution"); *cf. Annen v. Trump*, 913 S.W.2d 16, 22 (Mo. Ct. App. 1995) (holding that expert testimony was required to establish the standard of care for supervision of the installation of a roof and, thus, because the plaintiff failed to offer any expert testimony on the issue, the plaintiff failed to make a submissible case); *Pasta House Co. v. Williams*, 833 S.W.2d 460, 462 (Mo. Ct. App. 1992) (holding that the plaintiff failed to make a submissible professional negligence claim against an engineering firm and a professional surveying firm because the plaintiff did not present expert testimony on the standard of care required by an engineer and a surveyor).

### 2. *Enterprise's Motion*

#### a. *Parties' arguments*

In Enterprise's Motion, Enterprise argues that the court should grant summary judgment in its favor on Count IV because Plaintiffs have not designated an expert witness who will establish the applicable standard of care owed by self-directed IRA custodian banks and "expert testimony is essential to make a submissible claim for negligent conduct by a custodian bank" because this "standard of care [is] outside the knowledge of a lay jury." Brief in Support of Enterprise's Motion at 19-20.

In the Resistance to Enterprise's Motion, Plaintiffs contend that the Custody Agreement, Enterprise's policy manual for the Trust Department, *see* Enterprise Trust Policy Manual (docket no. 631-7 at 68-120; docket no. 631-8), and the Bank Secrecy Act/Anti-Money Laundering Manual establish the applicable standard of care in this case. Plaintiffs further argue that expert testimony is not required to prove that Enterprise acted negligently because "[a] layperson could easily understand the concept that Enterprise could not transfer funds without written authorization" and "in clear cases[,] expert testimony is unnecessary." Resistance to Enterprise's Motion at 16.

### b. *Application*

At the outset, the court finds that Plaintiffs' argument that the Enterprise Trust Policy Manual and the Bank Secrecy Act/Anti-Money Laundering Manual establish the applicable standard of care in this case is without merit. Plaintiffs fail to cite any courts recognizing a duty arising from a company's internal policies or the Bank Secrecy Act and numerous courts have rejected such an argument. *See Luscombe v. Mo. State Bd. of Nursing*, No. WD 75049, 2013 WL 68899, at *8 (Mo. Ct. App. Jan. 8, 2013) ("The standard of care applicable to professional conduct cannot be established by a hospital's rules and regulations, and even if it could, mere violation of a hospital rule or regulation does not establish a violation of the standard of care without expert testimony regarding whether the factual explanation for the violation is outside the standard of care."); *Pub. Serv. Co. of Okla. v. A Plus, Inc.*, No. Civ-10-651-D, 2011 WL 3329181, at *8 (W.D. Okla. Aug. 2, 2011) (noting that "[c]ourts have repeatedly rejected negligence claims based on a bank's duty under the [Bank Secrecy Act]"); *Armstrong v. Am. Pallet Leasing Inc.*, 678 F. Supp. 2d 827, 874-75 (N.D. Iowa 2009) (rejecting the plaintiffs' argument that the requirements under the Bank Secrecy Act imposed a duty of care on the defendant-bank); *Marlin v. Moody Nat'l Bank, N.A.*, No. H-04-4443, 2006 WL 2382325, at *7 (S.D. Tex. Aug. 16, 2006) ("[The Bank Secrecy Act] does not create a private right of action and, therefore, does not establish a standard of care."); *Aiken v. Interglobal*

*Mergers & Acquisitions*, No. 05 Civ. 5503 (LAP), 2006 WL 1878323, at *2 (S.D.N.Y. July 5, 2006) (noting that the Bank Secrecy Act does not afford a private right of action, and the court may not "impose a duty of care based upon a statute that does not permit a private right of action"). Thus, Plaintiffs cannot rely on Enterprise's internal policies or the Bank Secrecy Act to establish the standard of care.

Enterprise relies on the analysis in *Steward, III v. Wells Fargo Bank, N.A.*, No. 10-469 (MJD/FLN), 2011 WL 3207037 (D. Minn. June 10, 2011), *adopted*, 2011 WL 3206912 (D. Minn. July 28, 2011), to support its argument that the court should grant summary judgment in its favor with respect to Count IV. In *Steward, III*, the plaintiff, a Wells Fargo Bank, N.A. ("Wells Fargo") checking account holder, brought claims against Wells Fargo asserting conversion, defamation, libel, breach of banker's duty of confidentiality and negligence when the plaintiff deposited a $9,200 check into his Wells Fargo checking account and spent nearly all of the deposited money before the check was returned to its maker for forgery. *Id.* at *1. Wells Fargo charged the plaintiff's account $9,200, resulting in a negative balance. *Id.* Wells Fargo reported that the plaintiff's "account had been closed for 'account abuse'" to a consumer reporting agency. *Id.* at *2. The magistrate judge recommended that the district court judge grant summary judgment in favor of Wells Fargo on all counts, finding, among other things, that Wells Fargo was entitled to charge back the $9,200 from the plaintiff's account pursuant to the account agreement between the plaintiff and Wells Fargo and the plaintiff violated the account agreement when he failed to cover the overdraft for over a month after Wells Fargo requested the funds. *Id.* at *4. The plaintiff's negligence claim also failed because the plaintiff did not identify an expert to testify to the relevant standard of care. *Id.* at *6. In recommending that the district court judge grant summary judgment on the plaintiff's negligence claim, the magistrate judge held that "an expert is necessary to define the standard of care for Well's Fargo's actions, as these issues fall beyond the scope of a lay person's knowledge." *Id.* In addition to *Steward, III*, Enterprise cites numerous other

cases holding that an expert witness is necessary to establish the standard of care in a professional negligence case such as this one. *See* Brief in Support of Enterprise's Motion at 22, 22 n.7.

Plaintiffs have presented no evidence to define the relevant standard of care of a reasonably competent IRA custodian. Plaintiffs assert that expert testimony is not necessary to establish the standard of care in this case because "in clear cases[,] expert testimony is unnecessary." Resistance to Enterprise's Motion at 16. The court disagrees. The duties owed by an IRA custodian bank are beyond the knowledge of a layperson. *See Pedigo*, 102 S.W.2d at 607. Furthermore, this is not a case where the alleged negligence constitutes "clear and palpable" negligence. *Roberts*, 330 S.W.3d at 581. Enterprise's allegedly negligent acts are not comparable to, for example, a lawyer allowing a statute of limitations to expire. *See id.* at 581 n.4. Thus, Missouri law requires expert testimony to establish the applicable standard of care in a negligence claim such as this one. *See Annen*, 913 S.W.2d at 22; *Pasta House Co.*, 833 S.W.2d at 462. Because Plaintiffs will be unable to establish the applicable standard of care at trial, the court finds that there is no genuine issue of material fact as to Count IV. Accordingly, the court shall grant Enterprise's Motion to the extent that it requests that the court grant summary judgment in Enterprise's favor on Count IV.

### 3. *Plaintiffs' Motion*

#### a. *Parties' arguments*

In Plaintiffs' Motion, Plaintiffs argue that Section 12 of the Custody Agreements, which provides that Enterprise shall not be liable to Plaintiffs unless it engages in "gross negligence or willful misconduct," Thomas Currier Custody Agreement at 3, establishes the existence of a legal duty that Enterprise owed to Plaintiffs in carrying out its obligations under the Custody Agreements.

In its Resistance to Plaintiffs' Motion, Enterprise contends that it did not owe Plaintiffs a duty independent of its contractual obligations and that Plaintiffs' negligence

claim fails as a matter of law because Plaintiffs have failed to designate an expert witness to establish the relevant standard of care.

### b. Application

In light of the court's finding above that Plaintiffs' failure to designate an expert witness to testify to the relevant standard of care is fatal to their claims in Count IV, the court finds that it is not necessary to address the parties' specific arguments with respect to Plaintiffs' Motion. Thus, because the court shall grant summary judgment in Enterprise's favor on Count IV, the court shall deny Plaintiffs' Motion to the extent that it requests that the court grant summary judgment in Plaintiffs' favor on Count IV.

## VII. CONCLUSION

In light of the foregoing, **IT IS HEREBY ORDERED THAT**:

(1) Defendant Enterprise Bank & Trust's Motion for Summary Judgment (docket no. 614) is **GRANTED IN PART AND DENIED IN PART**. With respect to Counts I, II and IV, summary judgment is **GRANTED** in favor of Enterprise. In light of the court's RICO analysis, Counts I and II are **DISMISSED** as to all Defendants. With respect to Count III, summary judgment is **GRANTED** in favor of Enterprise as to Plaintiffs Bonita Cobb, Barbara Currier and William McLemore and is **DENIED** as to all other Plaintiffs.

(2) Plaintiffs' Motion for Summary Judgment (docket no. 626) is **DENIED**.

(3) Plaintiffs' are **DIRECTED** to file a Notice with the Clerk of Court listing the remaining Plaintiffs in Count III by **July 17, 2013**.

**DATED** this 9th day of July, 2013.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA